IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

REBECCA VEST,                               )
                                            )
        Plaintiff,                          )
                                            )      NO. 3:19-cv-1021
v.                                          )      JUDGE RICHARDSON
                                            )
THE NISSAN SUPPLEMENTAL                     )
EXECUTIVE RETIREMENT PLAN II                )
and NISSAN NORTH AMERICA,                   )
INC.,                                       )
                                            )
        Defendants.                         )

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' Motion to Dismiss, or Alternatively, Compel Arbitration and Stay Proceedings (Doc. No. 8, the "Motion"). Plaintiff filed a response (Doc. No. 10), and Defendants replied (Doc. No. 11). A subsequent Order by the Magistrate Judge (Doc. No. 14) instructed the parties to file supplemental briefing to address whether the Plan at issue is an Employee Retirement Income Security Act of 1974 ("ERISA") Plan. Defendants and Plaintiff both filed supplemental briefing on this issue. (Doc. Nos. 17, 18). Plaintiff filed a response to Defendants' supplemental briefing as permitted by the Magistrate Judge, (Doc. No. 21), and Defendants did not file a response to Plaintiff's supplemental briefing.

For the reasons stated below, the Motion will be denied.

1

## BACKGROUND[1]

Plaintiff joined Nissan in October 2009 as the Director of the Renault-Nissan Purchasing Organization. (Doc. No. 1 at ¶ 12). In its employment offer, Nissan informed Plaintiff that she would be eligible to participate in The Nissan Supplemental, Executive Retirement Plan II (the "Plan"), which factored into her decision to accept the offer of employment. (*Id.* at ¶ 13). In February 2011, Plaintiff was promoted to Vice President of Purchasing for Nissan North America. (*Id.* at ¶ 15). Plaintiff served in this position until April 2016 when Nissan restructured, at which time she became Vice President of Corporate Development and Social Responsibility. (*Id.* at ¶ 16). Plaintiff worked in this role until September 21, 2018, her last day of employment, which was two weeks after her submission of her resignation. (*Id.* at ¶¶ 16, 20). By then, Plaintiff had worked for Nissan a total of nine years. (*Id.* at ¶ 22). During her time with Nissan, Plaintiff received several solicitations of employment from Nissan's competitors, which she declined. (*Id.* at ¶ 22).

Plaintiff choose not to seek post-Nissan employment with a company she considered to be a "competitor" of Nissan, and instead selected Bridgestone as her next employer. (*Id.* at ¶ 23). Bridgestone's primary business is the manufacture and sale of tires and other rubber products, which it supplies to clients like Nissan. (*Id.* at ¶¶ 24, 26). Plaintiff's job with Bridgestone is as Senior Vice President of Procurement and Strategic Sourcing Partnerships. (*Id.* at ¶ 27). In this role, Plaintiff's "job duties relate to procurement in support of Bridgestone's businesses.

---

[1] The background facts are drawn from the Complaint and the documents filed with the Complaint. (Doc. No. 1). None of the facts recited herein are disputed by the parties. The Court therefore will rely on them, just as it would rely on undisputed facts when adjudicating a motion for summary judgment. *See Yaroma v. Cashcall, Inc.*, 130 F. Supp. 3d 1055, 1062 (E.D. Ky. 2015) ("in evaluating motions to compel arbitration, 'courts treat the facts as they would in ruling on a summary judgment.' " (quoting *Kovac v. Superior Dairy, Inc.*, 930 F. Supp. 2d 857, 864 (N.D. Ohio 2013))). The parties additionally submitted e-mail correspondence and other documents associated with this Motion, which the Court will rely on, as relevant, in its opinion.

Generally, her role is to define and manage commodity strategies and sourcing decisions, while ensuring business supply requirements are satisfied. As part of her sourcing responsibilities, [Plaintiff] also oversees Bridgestone's Firestone Natural Rubber business in Liberia." (*Id.*). Plaintiff's job duties do not relate to sales or contact with Nissan. (*Id.* at ¶ 28). Plaintiff believes that her employment with Bridgestone does not violate the noncompete agreement in the Plan. (*Id.* at ¶¶ 30, 31).

> The Plan's noncompetition provision states that an employee must refrain from:
>
> either directly or indirectly, solely or jointly with other persons or entities, owning, managing, operating, joining, controlling, consulting with, rendering services for or participating in the ownership, management, operation or control of, or being connected as an officer, director, employee, partner, principal, agent, consultant or other representative with, or permitting his/her name to be used with any business or organization (a "Competing Company") with which the Company competes.

(Doc. No. 1-2 at 10).

At some point,[2] Plaintiff submitted a claim for benefits under the Plan. On April 5, 2019, the Vice President for Human Resources at Nissan sent an "advisory position" to Plaintiff indicating that unless Plaintiff "provide[s] written confirmation that [she] is not providing products and services to other OEMs [Original Equipment Manufacturers], your SERP II benefit will be forfeited pursuant to Section 2.3(b) of the Plan." (Doc. No. 1 at ¶ 32; Doc. No. 1-3). Plaintiff responded to this advisory position with a request for review, and she also provided the Plan written confirmation that she does not provide products or services to other OEMS. (Doc. No. 1 at ¶ 33; Doc. No. 1-4; Doc. No. 1-5).

Defendants have not issued a decision on Plaintiff's request for review. (Doc. No. 1 at ¶ 8). In July 2019, Defendants asked Plaintiff for a two-week extension and told Plaintiff that the

---

[2] Despite scrutinizing the record, the Court does not see any indication of when Plaintiff made her claim.

Senior Vice Presidents (SVPs) still needed to meet. (*Id.* at ¶ 9). In August, Plaintiff requested an update from Defendants' counsel, who informed Plaintiff that one of the SVPs had just recently returned to the country. (*Id.*). The Claims Procedure states that a decision upon a request for review should be provided no later than 60 days after the request for review, unless there are "special circumstances" which will allow an additional 60 days for review. (Doc. No. 1-2 at 18-19).

Having received no decision on her request for review, Plaintiff sought arbitration with the American Arbitration Association. (*Id.* at ¶ 10). Nissan refused to consent to arbitration (at least on Plaintiff's terms), which led to Plaintiff withdrawing her arbitration claim and filing the present action in this Court. (Doc No. 1 at ¶ 8). Plaintiff brings causes of action for 1) denial of benefits, and 2) breach of contract. Defendant has brought the present Motion in order to dismiss the case or, in the alternative, to compel arbitration.

## LEGAL STANDARDS

The Federal Arbitration Act ("FAA") provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted).

Under the FAA, if a party establishes the existence of a valid agreement to arbitrate, the district court must grant the party's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3-4). Furthermore, "courts are to examine the language of the contract in light

4

of the strong federal policy in favor of arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citation omitted). Therefore, any doubts regarding arbitrability must be resolved in favor of arbitration. *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003).

Courts should also look at whether an arbitration clause is specific or general. "This Court has drawn a clear line between the extensive applicability of general arbitration provisions and the more narrow applicability of arbitration clauses tied to specific disputes. When faced with a broad arbitration clause, such as one covering any dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005). When an arbitration clause is general, "only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Id.* (quoting *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004)). In contrast, in a specific arbitration clause "a court cannot require arbitration on claims that are not included." *Id.*; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (citation omitted)).

Because arbitration agreements are fundamentally contracts, the enforceability of a purported agreement to arbitrate is evaluated according to applicable state contract law. *Seawright*, 507 F.3d at 972. "The presumption in favor of arbitration does not 'take [] courts outside [the] settled framework' of using principles of contract interpretation to determine the scope of an arbitration clause." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172–73 (3d Cir. 2014) (quoting *Granite Rock*, 130 S. Ct. at 2859). "Thus, the presumption of arbitrability applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand.

5

Otherwise, the plain language of the contract controls." *Id.* at 173 (citation omitted). "Ultimately, then, whether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim." *Id.* at 172. In making this determination, the Court should carefully analyze the contract language and not rely heavily on the legal theories present in the complaint. *Id.* at 173.

When considering a motion to dismiss and compel arbitration under the FAA, a court has four tasks:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout*, 228 F.3d at 714 (citing *Compuserve, Inc. v. Vigny Int'l Finance, Ltd.*, 760 F. Supp. 1273, 1278 (S.D. Ohio 1990)).

As noted above in a footnote, "in evaluating motions to compel arbitration, 'courts treat the facts as they would in ruling on a summary judgment.'"[3] *Yaroma*, 130 F. Supp. 3d at 1062 (quoting *Kovac*, 930 F. Supp. 2d at 864). "Therefore, the party opposing arbitration bears the burden of 'showing a genuine issue of material fact as to the validity of the agreement to arbitrate.' " *Id.* (citing *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)). Thus, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party opposing arbitration. *Id.*; *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)

---

[3] Although, for the reasons discussed, the Court ultimately does not find that the arbitration clause was triggered in this case, the Court still evaluates the Motion as a motion to compel arbitration and considers the facts as it would in a ruling on summary judgment. And although Defendant's motion is styled as "Motion to Dismiss, or Alternatively, Compel Arbitration and Stay Proceedings," the Motion is essentially only a motion to compel arbitration inasmuch as it presents the Court with no argument for dismissal on other grounds.

6

(stating that the party challenging arbitration has the burden of proving that the claims at issue are not arbitrable).

## DISCUSSION

### A. Subject Matter Jurisdiction

As a threshold matter, the Court finds that it has subject-matter jurisdiction over this case. In her Complaint, Plaintiff asserts that this Court (i) has subject-matter jurisdiction under 28 U.S.C. § 1331 over her denial-of-benefits claim because that claim arises under ERISA; and (ii) has supplemental jurisdiction under 28 U.S.C. § 1367 over her breach of contract claim. (Doc. No. 1 at ¶¶ 4, 5). Defendants contested subject-matter jurisdiction, claiming that the Plan is not an ERISA plan and that this Court therefore lacks subject matter jurisdiction. (Doc. No. 13 at 1). This prompted the Magistrate Judge to order supplemental briefing on the issue of whether the Plan is an ERISA Plan and what effect the status of the Plan would have on the arbitration clause at issue. (Doc. No. 14).

Despite previously contesting the characterization of the Plan as an ERISA Plan, Defendants reversed course in supplemental briefing and conceded that the Plan is indeed an ERISA Plan, specifically a so-called "top hat" plan, and that the Court has subject matter jurisdiction over the ERISA dispute. (Doc. No. 17 at 1-3). Both parties now agree that the contract before the Court is an ERISA Plan.[4] (Doc. No. 17; Doc. No. 1). Of course, parties cannot, merely by their consent, place their dispute within the subject-matter jurisdiction of a federal court. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (noting that "no

_____

[4] Though both parties now agree that the Plan is an ERISA plan, Plaintiff does not specifically stipulate that the Plan should be construed as a top hat plan.

7

action of the parties can confer subject-matter jurisdiction upon a federal court . . . . the consent of the parties is irrelevant . . .").

Federal courts have subject-matter jurisdiction over, among other things, "all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. Jurisdiction over such civil actions is known as federal-question jurisdiction. Plaintiff has brought a claim under ERISA, a federal statute, which she believes creates federal-question jurisdiction in this Court. However, with their mutual implication that the Plan must be an ERISA Plan for the Court to have subject-matter jurisdiction here, the parties miss the mark. The Sixth Circuit has found "that the existence of an ERISA plan is a nonjurisdictional element of Plaintiffs' ERISA claim." *Daft v. Advest, Inc.*, 658 F.3d 583, 587 (6th Cir. 2011). "[T]he existence of an ERISA plan must be considered an element of a plaintiff's claim under Section 502(a)(1)(B), not a prerequisite for federal jurisdiction." *Id.* at 590-91. "Because the existence of an ERISA plan is not a jurisdictional prerequisite, federal subject-matter jurisdiction lies over Plaintiffs' suit as long as they raise a colorable claim under ERISA. That is, federal jurisdiction exists over Plaintiffs' ERISA claim unless 'the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.' " *Id.* at 593 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (some internal quotation marks omitted)). In short, generally federal-question jurisdiction exists if the plaintiff has a valid ERISA *claim*, even if the case does not involve a valid ERISA *plan*.

Here, though the Court does not make an express determination regarding the type of plan the Plan is, or even if it is an ERISA plan, Plaintiff has certainly raised a colorable claim that this Plan is either an ERISA plan or an ERISA top hat plan. At the outset, the Court notes that the Plan itself contemplates the application of ERISA law: "[t]he Plan will be governed by the laws of

8

Tennessee, unless pre-empted by ERISA." (Doc. No. 1-2 at 17). The parties also both believe that the plan is an ERISA plan, indicating that it is not "frivolous" that the Plaintiff brings her claim under ERISA.

The Plan has many of the qualities of an ERISA plan. Typically, a plan is a general ERISA plan "if a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries, (3) the source of financing, and (4) the procedures for receiving benefits. The purported plan need not be formal or written to qualify as an ERISA benefit plan, but rather, the court must look to the 'surrounding circumstances' to see if the four factors have been met." (citation omitted)). *Williams v. WCI Steel Co.*, 170 F.3d 598, 602 (6th Cir. 1999). Some of the requirements do not appear to be met in the present case, most obviously the fact that the Plan is unfunded (a telltale sign of a top hat plan, as opposed to a general plan). (Doc. No. 1-2 at 15). Plaintiff purports that the Plan is funded and points the Court to the fact that the form of payment the Plan requires is "via executive payroll." (Doc. No. 18 at 5; Doc. No. 1-2 at 12). However, this assertion merely shows the avenue through which a participant received their funds in accordance with the Plan, not the source of the funds, as required by the Sixth Circuit. The Plan document itself states explicitly that the Plan is, in fact, unfunded. (Doc. No. 1-2 at 15).

In contrast, a top hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purposes of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. 1051(2); *see also Simpson v. Mead Corp.*, 187 F. App'x 481, 483 (6th Cir. 2006) (quoting *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 250 n.2 (6th Cir. 1989)). The Sixth Circuit has stated that "[i]n determining whether a plan qualifies as a top hat plan, we consider both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment

duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)."[5] *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (quoting *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 479 (N.D. Tex. 1999)). Though the Court does not make a determination of if the Plan is a top hat plan or not, the Court finds that there is a "colorable" claim of this being an ERISA top hat plan.

As to the first consideration, only a member of Senior Management of the company may participate in the Plan. (Doc. No. 1-2 at 9). Senior Management is defined as "a Director, Vice President, or Senior Vice President of the Company, and such other senior level employee of the Company as may be approved from time to time by the Board of Directors of the Company or its delegate or Administrative Committee." (*Id.* at 22). Though Defendants did not provide the Court with precise numbers of Senior Management and non-Senior Management employees employed by Defendants, this clearly limits Plan participation to the upper echelon of Nissan. Second, there is evidence that Plaintiff, and presumably others participating in the Plan, possessed high levels of expertise and responsibility for many key operations of the company. (Doc. No. 1-5 at 2). Third, although Defendants also did not provide any information on the payment levels that the top hat

---

[5] Notably, as indicated, the four qualitative and quantitative considerations are factors, not prerequisites. This distinction between factors and prerequisites is a very real one, as the undersigned has noted in a recent opinion involving a different context. *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *3 (M.D. Tenn. Aug. 28, 2020) (Richardson, J.) (noting that the four factors of the preliminary injunction test (albeit with a twist) "are 'factors to be balanced, not prerequisites to be met'") (quoting *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009))). And as the undersigned has previously noted in some detail, the distinction can be quite consequential; although it is not fatal for a party if it cannot show that a particular factor cuts in its favor, it is (fatally) dispositive for a party to be unable to show a prerequisite it bears the burden of showing. *See* Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 84 (1995).

plan members received, it is readily inferable that the top-ranking executives at Nissan were paid at a higher level than others in the company. Finally, the Plan language itself implies that it is a top hat plan. The Plan is entitled "The Nissan Supplemental, Executive Retirement Plan II," thus reflecting the nature of a top hat plan, which is to reward executives. (Doc. No. 1-2). Because the Plan is likely a top hat plan, Plaintiff has brought a colorable claim under ERISA.

However, the Court does not need to make a determination in this case of if this is an ERISA top hat plan (or even an ERISA plan at all, as discussed above), and the Court will not do so when it is not dispositive of the case and the parties have presented so little argument or evidence on the subject. Defendants assert, without citation or argument, in their Supplemental Brief that "Defendants stipulate the Plan is an ERISA 'top hat' plan." (Doc. No. 17 at 1). Defendants cannot unilaterally stipulate to something that they have the burden of proving.[6] Though the Court believes it is likely that the Plan is an ERISA top hat plan, the Court is unsure how it would rule if it needed to resolve this issue. The Court will expect the parties to present the Court with more fulsome briefing on this issue should it become material or contested in this case or one of the related cases.

---

[6] Typically, because an employer advocates for top hat status to avoid the substantive provisions of ERISA, the employer-defendant bears the burden of proving that the Plan is a top hat plan. *Daft*, 658 F.3d at 596. Though the current procedural posture is somewhat atypical due to the supplemental briefing, in this case Defendants would have the burden of showing that this is a top hat plan because they raised the jurisdictional issue by questioning this Court's subject matter jurisdiction, and they stated that this was a top hat plan. Despite Defendants' assertion that they stipulate that the Plan is a top hat plan, Plaintiff has not stipulated to the fact that the Plan is a top hat plan. And she certainly has an incentive not to; as discussed below, Plaintiff would lack many substantive rights under ERISA were the Plan a top hat plan instead a general ERISA plan. Defendants cannot make a cursory reference to "stipulating" to the Plan being a top hat plan and expect the Court to automatically resolve the issue in favor of Defendants.

For these reasons, the Court finds that it has subject-matter jurisdiction, irrespective of whether the Plan is an ERISA Plan, because Plaintiff has brought a "colorable" claim under ERISA.

### B. Exhaustion

In her Complaint, Plaintiff states that she has exhausted her administrative remedies under the Plan. (Doc. No. 1 at 2).[7] Additionally, Plaintiff argues that any further exhaustion of the administrative remedies would be futile. (*Id.*). Therefore, regarding exhaustion, Plaintiff's Complaint makes two distinct assertions; the first is that she has exhausted her administrative remedies, and the second seemingly is premised on the notion that she has *not* administratively exhausted her remedies (but is excused from doing so due to futility).

"The administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). "This is the law in most circuits despite the fact that ERISA does not explicitly command exhaustion." *Ravencraft v. UNUM Life Ins. Co. of Am.*, 212 F.3d 341, 343 (6th Cir. 2000).

An applicable regulation provides that:

> Except as provided in paragraph (l)(2) of this section, in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

---

[7] Plaintiff similarly made these exhaustion arguments in her prior Arbitration Demand. (Doc. No. 9-1 at 2-3).

29 C.F.R. § 2560.503-1(l)(1). Though the Court has not determined the type of plan before it, this provision has regularly been found to apply to top hat plans (which is what Defendants claim the Plan is) as well as to garden-variety ERISA plans (which is what Plaintiff claims the Plan is).[8] *Paula Campbell v. Sussex Cty. Fed. Credit Union*, 602 F. App'x 71, 72 (3d Cir. 2015); *Maynard v. Merrill Lynch & Co.*, No. 8:07-CV-1149-T-23MSS, 2008 WL 4790670, at *9 (M.D. Fla. Oct. 28, 2008); *Hoak v. Plan Adm'r of Plans of NCR Corp.*, 389 F. Supp. 3d 1234, 1270 (N.D. Ga. 2019).

Additionally, "when extraordinary circumstances are presented, the trial court may, in its sound discretion, excuse a plaintiff's failure to satisfy the administrative exhaustion requirement." *Borman v. Great Atl. & Pac. Tea Co.*, 64 F. App'x 524, 528 (6th Cir. 2003) (footnote omitted). "Although ERISA's administrative exhaustion requirement for claims brought under § 502 is applied as a matter of judicial discretion, a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made. A plaintiff must show that

---

[8] Typically, top hat plans are almost entirely exempt from ERISA's substantive requirements, including ERISA's minimum participation standards, minimum vesting standards, some content requirements, the anti-cutback provision, minimum funding requirements, fiduciary responsibility provisions (including the requirement of a written plan, giving control to a trustee, liability on fiduciaries, and limitations on transactions and investments), and reporting and disclosure requirements. *Simpson*, 187 F. App'x at 483-84 (citing and quoting applicable statutes and case law). Essentially, "[t]op hat plans are basically only subject to the enforcement provisions of ERISA." *Id.* at 484 (internal quotation marks and citation omitted); *Picard v. Best Source Credit Union*, No. 04-CV-71008-DT, 2005 WL 2665639, at *5 (E.D. Mich. Aug. 10, 2005) ("ERISA governs suits to recover benefits owed under a top hat plan.").

13

'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'" *Id.* (internal citations and quotation marks omitted).

Here, Defendants have failed to follow the Claims Procedure and provide Plaintiff with a decision on the merits of her claim, and the Court will therefore deem Plaintiff's claim exhausted. The Plan's Claims Procedure, found in Section 7.12 of the Plan, enumerates the process as (a)-(j), with the Arbitration Clause being (j). (Doc. No. 1-2 at 18). The Claims Procedure is essentially summarized as: (a) a claim is presented in writing; (b)-(d) a Claims Official, within a reasonable time, considers the claim and issues a determination; if granted, an appropriate distribution will be made, or if denied, the Claims Official will provide written notice of denial within 90 days; (e) the Participant will have a reasonable opportunity to appeal; (f) review by an Administrative Committee will occur within 60 days, "unless special circumstances require an extension of time for processing" in which case a decision shall be rendered as soon as possible but not later than 120 days; (h) a decision will be given in writing; (i) the determination will be binding on all parties unless a court or arbitrator finds it constituted an abuse of discretion; and (j) "[f]urther review of claims shall be solely through confidential arbitration proceedings." (*Id.* at 18-19). Defendants failed to follow this Claims Procedure when handling Plaintiff's request for benefits.

In April 2019, Defendants provided Plaintiff with an "advisory position," and Plaintiff requested review of that advisory position in May 2019.[9] (Doc. Nos. 1-3, 1-4). In her Complaint,

---

[9] Plaintiff argues at several points in her Complaint and briefing that there has been no "initial determination" (meaning a decision of denial of benefits) in this case. (Doc. No. 10 at 11). The heart of the issue seems to be that Defendants provided Plaintiff only with a letter that called itself an "advisory position." (Doc. No. 1-3). The parties do not point the Court to any case law regarding whether an advisory position, such as the one at issue here, should be considered a "decision." The Court has been unable itself to find any case law or prior interpretation of a similar document to guide its decision. The Plan itself has no reference to an advisory position, or to proper procedures for appealing an advisory position, or what level of the Claims Procedure an advisory position falls under. From the language of the advisory position, it does appear to the Court to contain all the

Plaintiff states that her counsel spoke with Defendant's counsel, who requested a two-week extension.[10] (Doc. No. 1 at 3). Defendants' counsel emailed Plaintiff's counsel indicating that the review was not with the SERP Administrative Committee as contemplated in the Claims Procedure, but with the Senior Vice Presidents ("SVPs"), and that "[i]t won't take too long as soon as the SVP's can meet or talk as they want or need to." (Doc. No. 10-1 at 1). In an email in August responding to a request for an update from Plaintiff's counsel, Defendants' counsel indicated that they were still waiting on one of these SVPs who had recently returned to the country. (Doc. No.

_____

elements of a decision of denial prescribed by Section 7.12(d) of the Plan: Defendants provided Plaintiff with the reason for the decision of denial, references to the Plan document, a description of additional information needed to perfect the claim, and an explanation of the review procedure. Plaintiff apparently initially construed this as a decision of denial. She responded to this advisory position letter by calling the advisory position a "denial" and "seek[ing] a reversal." (Doc. No. 1-4 at 5). At this point, it appears that both Plaintiff and Defendants agreed that this advisory position constituted a "decision." And Defendants emphatically still maintain that it was a decision. (Doc. No. 11 at 3).

Though this would appear to answer conclusively the question of whether an initial decision of denial was issued, Plaintiff posits in briefing that although the advisory position initially appeared to be a decision, she now believes the advisory position's issuance was an earlier procedural step as explained by some of Defendants' counsel's emails, which seem to contemplate the advisory position as something less than a decision of denial. (Doc. No. 10 at 6). Despite these references in the emails, Defendants have maintained throughout briefing that this was a decision (of denial, of course). (Doc. No. 11 at 3). Regardless of all of this confusion between the parties, the Court finds that a decision of denial was reached with the initial advisory position, pursuant to Claims Procedure Subsection 7.12(d). The Court also notes that in arguing otherwise, Plaintiff is effectively forgetting the primary claim in her case: that she suffered a wrongful "[d]enial of [b]enefits" as alleged in Count I. (Doc. No. 1 at 9).

[10] Later, in emails sent in September, Defendants claimed that they were never at the review stage in Section 7.12 but rather at a preceding stage prescribed by Section 2.3. But the alleged request for an extension of two weeks implies otherwise, since the review process in Section 7.12 has deadlines but the process in Section 2.3 does not. Also, Defendants' counsel seemingly implied a belief that the parties were then engaged in a process encompassed by Section 7.12 when he referred to the "special circumstances" exception of Section 7.12: "Your or my view of whether special circumstances exist or not for the additional time probably isn't all that important to the world, but the important thing is that the Company is not delaying Ms. Vest's request and the administration of the appeal of the denial nor the next steps." (Doc. No. 10-1).

10-2).[11] Then, in an email in September, Defendants' counsel clarified that they were not even at the review process contained in Section 7.12 of the Plan, but they were instead "only at the procedural step" laid out in Section 2.3(b) of the Plan. (Doc. No. 10-3). Counsel stated that the review contemplated in Section 7.12 of the Plan would come:

> after they [the SVPs] decide, as they have every right to overturn the original claim denial which would make any review unneeded. I realize that if they decide that it was a competing employment, then it's unlikely on these facts that a subsequent review would be expected to reverse the original denial, but it certainly could. If you also believed that it would not be likely, then the practical approach would be just to take it to arbitration and let an arbitrator decide if she is entitled to benefits or not. We can do that after the Senior Vice Presidents issue their determination without further review if you want I guess.

(*Id.*).

The Court is confused by Defendants' counsel's reference to Section 2.3 prescribing "a procedural step" and a type of review that can overturn an initial decision of denial. Section 2.3 appears in an entirely separate section of the Plan than the Claims Procedure laid out in Section 7.12; rather than discussing Claims Procedure, it prescribes certain obligations (of, among other things, nondisclosure and loyalty) of Plan participants, as well as consequences for violating such obligations and a mechanism for deciding whether any alleged violations have in fact occurred. The part of Section 2.3 that counsel appears to have been referencing—the second paragraph of subsection 2.3(b)—states:

> Accordingly, if the Participant is found by a majority vote of the Senior Vice Presidents of the Company to have violated in any way the restrictions and requirements imposed on him by any such nondisclosure and confidentiality agreement and provisions above, or to have engaged in any act of fraud against or disloyalty to the Company (as defined for purposes of Section 2.3(b), or to have disparaged the Company (as defined for purposes of Section 2.3(b)) and/or its management, or if the Participant accepts any position as an employee of or a

---

[11] Plaintiff indicates in her Complaint that she received no communication from Defendants' counsel since this date, (Doc. No. 1 at 4), but she also filed an email from September as an attachment to her Response. (Doc. No. 10-3).

consultant to any Competing Company, then the Company, notwithstanding any other provision herein, will have no further obligation to make any payment of any benefit deemed accrued hereunder to the Participant or to the Participant's designated beneficiary or estate.

(*Id.* at 10). Thus, subsection 2.3(b) indicates that if a Plan participant is suspected of having committed any such violation, the SVPs must vote to determine whether she has in fact committed such violation(s), in which case she is effectively disqualified from receiving any further payment under the Plan. Beyond suggesting that a finding (by majority SVP vote) of such disqualifying violation(s) could occur at any time while the Company otherwise has "further obligation to make . . . payment"—*i.e.*, has not made all payments otherwise due to the Plan participant—this subsection otherwise provides no information at all (and certainly no details) on when or how this vote should occur. And Section 3.4 of the Plan provides that payment under the Plan is made in a single lump sum paid "during the month following the six month anniversary of the last day worked." (*Id.* at 12). The time of payment thus identified naturally would arrive after the institution of the Claims Procedure of Section 7.12—after the making, and perhaps even after the granting or denying, of a claim under the Claims Procedure.

The subsection thus indicates that the SVP vote does not necessarily have to be made at the outset of the Claims Procedure for a participant's claim for benefits and could instead be made after an initial determination of a claim. The language of this provision (and its location in the Plan), indicate to the Court that it is not part of the Claims Procedure, but rather a different avenue that Defendants can use at any time (even after a decision to grant benefits) to deny benefits to a Plan beneficiary deemed to have committed a violation of the kind referred to in subsection 2.3(b).

Thus, subsection 2.3(b) itself does not suggest that a determination by SVPs that an employee did not commit the violations referred to in subsection 2.3(b) is a step in the Claims Procedure, let alone a step that must come before any particular step(s) in the Claims Procedure

17

set forth in Section 7.12. Instead, the provision suggests that any determination as to whether an employee committed the violations referred to in Subsection 2.3(b) is a determination made (if at all) outside of the Claims Procedure, at an unspecified time not tied in any way to the steps of the Claims Procedure.

In suggesting otherwise in his email, counsel for Defendants revealed that Defendants simply were not following their Claims Procedure, but rather were injecting unwarranted steps into the procedure that served to delay its completion. In particular, while the SVPs stalled on making a determination under subsection 2.3(b), Defendants apparently ignored the time frames set out in their own Claims Procedure in Section 7.12, which states that "[t]he decision by the review official upon review of a claim shall be made no later than 60 days after his receipt for review, unless special circumstances require an extension of time for processing, which extension shall be made by the Administrative Committee; in which case a decision shall be rendered as soon as possible, but not later than 120 days after receipt of such request for review."[12] (Doc. No. 18 at 18-19). From the Plan language, there is no indication that this time period may or should be stayed or otherwise postponed past 120 days if a determination under subsection 2.3(b) happens to remain pending before the SVPs. Instead, as previously discussed, the Claims Procedure does not mention or have any apparent temporal relationship with Section 2.3 of the Plan.

Therefore, to comply with their own Claims Procedure, Defendants should have issued a decision on Plaintiff's claim within 60 days, or within 120 days if "special circumstances" were present. Because subsection 2.3(b) contains no deadline, then under Defendants' (unsupported) implied assertion that the SVPs' vote under subsection 2.3(b) can or should come prior to particular

---

[12] This subsection of the Plan appears to contain a typo. The Court is unsure what was meant by "receipt for review," which triggers the 60 day window time. The Court believes the intended phrase was likely "receipt of request for review."

steps in the Plan, Defendants could have continued to delay into perpetuity and never given Plaintiff a review of her claim while waiting on the SVPs to decide whether she was disqualified from receiving benefits.[13] This would not be allowable under either the language of the Plan or the requirements of ERISA, which mandate timeframes that mirror the requirements of the Plan.[14]

---

[13] Defendants note in their Reply that the SVPs ultimately voted to uphold (by 4-1 vote) the decision of denial. (Doc. No. 11 at 3). Defendants provide the Court with no citation to documentation of this vote in the record and no information on when the vote occurred. It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record). Moreover, the Federal Rules of Civil Procedure are clear that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1). Regardless, because of the procedural posture of this case and the limited record, the Court feels that it has thoroughly reviewed all briefing and attachments by the parties, and it has seen no evidence of Defendants' assertion that SVPs upheld the decision of denial. The Court, therefore, does not consider this statement of Defendants in reaching its decision. And even if the Court were to consider this statement, it would not help Defendants. To the contrary, because the Claims Procedure does not contemplate a vote by SVPs as to whether to uphold a decision of denial, the statement would merely further confirm what the Court has found herein: that Defendantsdid not follow their Claims Procedure, omitting steps therein while also inserting steps not included therein. Additionally, the Court notes that although Defendants claim that the SVPs completed their vote, Defendants never claim that an appeals process was completed.

[14] 29 C.F.R. § 2560.503-1 provides that:

> Except as provided in paragraphs (i)(1)(ii), (i)(2), and (i)(3) of this section, the plan administrator shall notify a claimant in accordance with paragraph (j) of this section of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60–day period. In no event shall such extension exceed a period of 60 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review.

19

Plaintiff filed her claim for arbitration[15] with the American Arbitration Association (AAA) after receiving no vote or decision from the SVPs. (Doc. Nos. 10-4, 9-1). Defendants responded and did not contest arbitration, but requested assurance that AAA arbitration rules would yield to any contrary arbitration rules prescribed by the Plan. (Doc. No. 10-5). After a series of back and forth discussions regarding the rules to apply at arbitration, Plaintiff withdrew her demand for arbitration and filed the present action in federal court.

Because Defendants failed to follow the Claims Procedure as laid out in the Plan, the Court finds that Plaintiff properly exhausted her rights and can bring a claim in federal court. *Nale v. Ford Motor Co. UAW Ret. Plan*, 703 F. Supp. 2d 714, 720 (E.D. Mich. 2010) ("Defendant thus failed to follow its own Claims Procedure. Pursuant to federal regulations, Plaintiff is 'deemed to have exhausted the administrative remedies available under the plan.'" (quoting 29 C.F.R. § 2560.503-1(l)). Having found that Plaintiff is deemed to have exhausted her administrative remedies under the Plan, the Court does not reach the issue of whether it would be appropriate to excuse Plaintiff from the exhaustion requirement on the grounds that exhaustion would be futile.

---

[15] The Court notes that an arbitration clause is part of the Claims Procedure, and courts have found that when the arbitration clause is mandatory it must be exhausted before bringing a claim in federal court. "Thus, if the plan contains an arbitration clause, the plaintiff must arbitrate the dispute in accordance with the clause in order to exhaust his administrative remedies before filing suit in federal court." *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000); *In re Zahl v. Local 641 Teamsters Welfare Fund*, No. CIV.A. 09-1100, 2010 WL 1931235, at *3 (D.N.J. May 13, 2010). However, in this case, Defendants' refusal to review Plaintiff's claim in accordance with the Claims Procedure means that the arbitration clause was never triggered. Plaintiff exhausted her remedies by trying to get her initial decision reviewed with no success.

Notably, Plaintiff did not, by filing an Arbitration Demand, admit that the Claims Procedure had properly wound its way to the arbitration stage. In her arbitration filings, Plaintiff does not indicate that the arbitration filing was mandatory. (Doc. No. 9-1). And for their part, Defendants made no protest that arbitration was mandatory when Plaintiff withdrew her arbitration demand. (Doc. No. 10-13 at 1).

In short, Plaintiff is indeed required to exhaust her administrative remedies, including arbitration, but she is deemed to have done so pursuant to 29 C.F.R. § 2560.503-1(l)(1), as explained herein.

20

As a consequence of Plaintiff properly exhausting her administrative remedies, she is "entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l)(1). As this action is an available remedy under section 502(a) of the Act, she is entitled to pursue it. And she is entitled to do so irrespective of any obligation the Plan purportedly imposes on her to arbitrate; any such arbitration is among the administrative remedies Plaintiff is deemed to have exhausted. And since she has exhausted them, she is not required to exhaust them again (even partially) by returning to them—such as by returning to the administrative remedies (*i.e.*, Claims Procedure) to arbitrate. The fact that arbitration never occurred here does not serve to suggest that it should occur now; instead, it serves merely to highlight the reason why it never occurred: Defendants simply failed to follow their own Claims Procedure and thus "failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *Id.* That being so, Plaintiff need not now return to the Claims Procedure disregarded by Defendants.[16]

**CONCLUSION**

For the reasons discussed, the Motion will be denied.[17]

_____

[16] The Court realizes that it appears critical of how Defendants (and counsel) have handled the claims process here at issue. That is not the Court's intent; the Court's intent is solely to explain why it is reaching the decision it is reaching. Also, the Court agrees with Defendants that Plaintiff (and counsel) are hardly blameless in all of the confusion and wheel-spinning, inasmuch as Plaintiff has changed her tune about whether there ever was an initial denial of her claim. (Doc. No. 11 at 3). But it is Defendants, and not Plaintiff, that ultimately bear the responsibility to be clear (and correct) as to where things stand in the claims process and to ensure that the process runs according to the Plan; if Defendants do not do so, then they have "failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l)(1).

[17] Because the Court denies Defendants' Motion on other grounds, the Court does not address Plaintiff's argument that the doctrine of judicial estoppel applies to the facts of this case. (Doc.

21

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

No. 10 at 19). In a similar argument, Plaintiff states in her Response (without citation) that "Nissan appears to argue that [Plaintiff's] attempt to pursue arbitration as a means of alternate dispute resolution waives her right to litigate her claim." (Doc. No. 10 at 14). The Court does not see this argument in Defendant's Motion, and so the Court also declines to address it.