IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

REBECCA VEST,                            )
                                         )
        Plaintiff,                       )        NO. 3:19-cv-01021
                                         )
v.                                       )        JUDGE RICHARDSON
                                         )
THE NISSAN SUPPLEMENTAL                  )
EXECUTIVE RETIREMENT PLAN II             )
and NISSAN NORTH AMERICA,                )
INC.,                                    )
                                         )
        Defendants.                      )

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Rebecca Vest's Motion for Judgment on the Pleadings (Doc. No. 85, "Motion"), filed along with a sealed exhibit (Doc. No. 88-1) and memorandum of law (Doc. No. 88-2).[1] Defendants filed a response under seal. (Doc. No. 97).[2] Plaintiff replied under seal. (Doc. No. 102).[3]

## BACKGROUND[4]

A. Factual background

Plaintiff joined Nissan North America, Inc. ("Nissan") in October 2009 as the Director of the Renault-Nissan Purchasing Organization. (Doc. No. 41 at ¶ 12). In its employment offer,

---

[1] The Court herein cites to the sealed, unredacted versions of any relevant filings. Plaintiff also filed an unsealed, redacted version of her supporting memorandum of law. (Doc. No. 86).

[2] An unsealed, redacted version of Defendants' response was also filed. (Doc. No. 95).

[3] An unsealed, redacted version of Plaintiff's reply was also filed. (Doc. No. 100).

[4] The Court cites herein to the Amended Complaint (Doc. No. 41) for any facts that are undisputed by Defendants (or otherwise "unable to be confirmed or denied" by Defendants), and cites to the Answer to the Amended Complaint (Doc. No. 45) for any disputed facts.

Nissan informed Plaintiff that she would be eligible to participate in The Nissan Supplemental, Executive Retirement Plan II (Doc. No. 41-1, the "Plan"). (*Id.* at ¶ 13). In February 2011, Plaintiff was promoted to Vice President of Purchasing for Nissan North America. (*Id.* at ¶ 15). Plaintiff served in this position until April 2016 when Nissan restructured, at which time she became Vice President of Corporate Development and Social Responsibility. (*Id.* at ¶ 16). Plaintiff worked in this role until September 21, 2018, her last day of employment, which was two weeks after her submission of her resignation. (*Id.* at ¶¶ 16, 20). By then, Plaintiff had worked for Nissan for a total of nine years. (*Id.* at ¶ 22).

After leaving Nissan, Plaintiff accepted a position with Bridgestone. Bridgestone's primary business is the manufacture and sale of tires and other rubber products, which it supplies to clients like Nissan and "to OEMs [original equipment manufacturers] that directly compete with NNA."[5] (*Id.* at ¶¶ 24, 26; Doc. No. 45 at ¶ 24, 26). Plaintiff's position with Bridgestone is Senior Vice President of Procurement and Strategic Sourcing Partnerships. (Doc. No. 41 at ¶ 27). In this role, Plaintiff's "job duties relate to procurement in support of Bridgestone's businesses. Generally, her role is to define and manage commodity strategies and sourcing decisions, while ensuring business supply requirements are satisfied. As part of her sourcing responsibilities, [Plaintiff] also oversees Bridgestone's Firestone Natural Rubber business in Liberia." (*Id.*). Bridgestone "announced" that Plaintiff would be "responsible for leading the integrated procurement organization at

---

[5] The Court uses Defendants' quoted language here and accepts as true that Bridgestone supplies to companies that directly compete with NNA. In so doing, however, the Court does not accept as true that *Bridgestone* (as opposed to automobile manufacturers that compete with NNA) is a "Competing Company" for purposes of the Plan. The Court will discuss this topic in detail below.

Bridgestone" and would be "working across the Americas with consumer and commercial tire businesses, marketing, and logistics and supply chain." (Doc. No. 45 at ¶ 28).[6]

## The Plan

The Plan states that "[a] member of Senior Management of the Company[7] (as defined in Exhibit I) is eligible to become a Participant in the Plan; provided that such employee is confirmed as a Participant by the Administrative Committee in writing." (Doc. No. 41-1 at ¶ 2.1(a)). Exhibit I, in its entirety, states, "A member of Senior Management means a Director, Vice President, or Senior Vice President [("SVP")] of the Company, and such other senior level employee of the Company as may be approved from time to time by the Board of Directors of the Company or its delegate or Administrative Committee." (*Id.* at 22). The Plan defines "Participant" as "an employee of the Company who meets the eligibility requirements of Section II and is confirmed as set forth in Section II." (*Id.* at ¶ 1.12). "A Participant must attain a minimum of five (5) years of Participation Service in order to be eligible to receive a Supplemental Plan Benefit." (*Id.* at ¶ 3.2).

## The Claims Procedure

Section 7.12 of the Plan, entitled "Claims Procedure," states at the outset that "[b]enefits shall be paid in accordance with the provisions of this Plan." (Doc. No. 41-1 at 17). It then sets

---

[6] In the Answer, Defendants contend that they are "without information or belief sufficient to admit or deny the allegations of Paragraph 27 [of the Amended Complaint]," which concerns Plaintiff's job duties at Bridgestone. (Doc. No. 45 at ¶ 27; Doc. No. 41 at ¶ 27). Yet in the very next paragraph of the Answer, Defendants expressly purport to have knowledge of what "Bridgestone announced" would be Plaintiff's job responsibilities at Bridgestone. (Doc. No. 45 at ¶ 28). Defendants do not identify where this announcement was made, or take a position as to the accuracy of this "announce[ment]," or allege that these in fact ever have been Plaintiff's actual job duties at Bridgestone.

[7] The Plan defines "Company" as "Nissan North America, Inc. [*i.e.*, "Nissan," as that term has been coined above by the Court], any successor thereto, and any Affiliated Company that has adopted this Plan in accordance with Section IX." (Doc. No. 41-1 at ¶ 1.7).

forth the procedure for the making, determination, and (potential) payment of a claim made by a claimant. First, the claim must be made in writing to the Claims Official (who is appointed by the Administrative Committee). (*Id.* at ¶ 7.12(a)). The Claims Official then, "within a reasonable time," considers the claim and issues a determination in writing. (*Id.* at ¶ 7.12(b)). If the claim is granted, "the appropriate distribution or payment shall be made" as a lump sum "during the month following the six month anniversary of the last day worked." (*Id.* at ¶¶ 7.12(c), 3.4).

If the claim is denied wholly or in part, the Claims Official must (within 90 days) provide a written notice of the denial that includes the reason for denial, the provision on which the denial is based, a description of additional material or information necessary to "perfect" the claim, and an explanation of the claim review procedure. (*Id.* at ¶ 7.12(d)). The Claims Official must provide the claimant a "reasonable opportunity to appeal the denial of a claim to the Administrative Committee (or other duly appointed review official)," and may establish a deadline for requesting review of a denial (as long as such deadline is at least 60 days after receipt of a denial).[8] (*Id.* at ¶ 7.12(e)-(f)). The "review official"—a term that clearly is intended to refer to the Administrative Committee if there is no "other duly appointed review official" with respect to the appeal—then must render a decision no later than 60 days after receiving the request for review, although the Administrative Committee can extend the decision deadline for up to 60 days if special circumstances so warrant. (*Id.* at ¶ 7.12(g)).

"The decision must be in writing and shall include specific reasons for the decision written in a manner calculated to be understood by the claimant with specific references to the pertinent

---

[8] The Claims Procedure uses the word "appeal" as a verb only in this one place, and does not use the word "appeal" as a noun. As used here, the verb "appeal" appears synonymous with "request a review," which, in various permutations, is the term otherwise used in the Claims Procedure. Notably, despite the terminology suggesting that a claimant has the right only to merely *request* a review of a denial of claim, the Claims Procedure clearly contemplates that a claimant actually has a right to *receive* a review upon a timely request for review.

Plan provision on which the decision is based." (*Id*. at ¶ 7.12(h)). "In considering claims, the Administrative Committee, the review official, and the claims official shall have full discretionary power and authority to make findings of fact and to construe the terms of the Plan and, to the full extent permitted by law, the determination of the claims official (if no review has been properly requested) shall be final and binding on all parties unless held by a court or arbitrator to constitute an abuse of discretion." (*Id*. at ¶ 7.12(i)). Any "further review of claims"—as might naturally be requested by a Participant disappointed by the review official's decision—"shall be solely through confidential arbitration[.]" (*Id*. at ¶ 7.12(j)).

Subsection 2.3(b)'s non-competition provision

The Plan includes a non-competition (non-compete) provision, which states that an employee must refrain from:

> either directly or indirectly, solely or jointly with other persons or entities, owning, managing, operating, joining, controlling, consulting with, rendering services for or participating in the ownership, management, operation or control of, or being connected as an officer, director, employee, partner, principal, agent, consultant or other representative with, or permitting his/her name to be used with any business or organization (a "Competing Company") with which the Company competes.

(*Id*. at ¶ 2.3(b)). The Court previously explained the mechanics of this provision:

> [The non-competition provision] indicates that if a Plan participant is suspected of having committed any such violation, the SVPs must vote to determine whether she has in fact committed such violation(s), in which case she is effectively disqualified from receiving any further payment under the Plan. Beyond suggesting that a finding (by majority SVP vote) of such disqualifying violation(s) could occur at any time while the Company otherwise has "further obligation to make . . . payment"—i.e., has not made all payments otherwise due to the Plan participant— this subsection otherwise provides no information at all (and certainly no details) on when or how this vote should occur. And Section 3.4 of the Plan provides that payment under the Plan is made in a single lump sum paid "during the month following the six month anniversary of the last day worked." (*Id*. at 12.) The time of payment thus identified naturally would arrive after the institution of the Claims Procedure of Section 7.12—after the making, and perhaps even after the granting or denying, of a claim under the Claims Procedure.

The subsection thus indicates that the SVP vote does not necessarily have to be made at the outset of the Claims Procedure for a participant's claim for benefits and could instead be made after an initial determination of a claim. The language of this provision (and its location in the Plan), indicate to the Court that it is not part of the Claims Procedure, but rather a different avenue that Defendants can use at any time (even after a decision to grant benefits) to deny benefits to a Plan beneficiary deemed to have committed a violation of the kind referred to in subsection 2.3(b).

Thus, subsection 2.3(b) itself does not suggest that a determination by SVPs that an employee did not commit the violations referred to in subsection 2.3(b) is a step in the Claims Procedure, let alone a step that must come before any particular step(s) in the Claims Procedure set forth in Section 7.12. Instead, the provision suggests that any determination as to whether an employee committed the violations referred to in Subsection 2.3(b) is a determination made (if at all) outside of the Claims Procedure, at an unspecified time not tied in any way to the steps of the Claims Procedure.

(Doc. No. 34 at 17).

<u>Plaintiff's claim for benefits</u>

At some point,[9] Plaintiff submitted a claim for benefits under the Plan.[10] On April 5, 2019, the Vice President for Human Resources at Nissan sent what she deemed an "advisory position" to Plaintiff that stated that "[the Administrative] Committee historically has not allowed employees to collect benefits and work for vendors that provide products or services to OEMs, unless their work related exclusively to Nissan/Infiniti or Nissan/Infiniti dealers" and that

[s]ince the publicly available information regarding [Vest's] position indicates that [Vest] [is] not able to work exclusively with or for the benefit of Nissan/Infiniti, the [Administrative] Committee has decided that under the terms of the SERP II, [Vest] [is] not permitted to work for a vendor that provides products to multiple OEMs and collect SERP II benefits.

---

[9] Despite scrutinizing the record, the Court does not see any indication of when Plaintiff made her claim.

[10] The Court uses the term "benefits" (plural) to refer to a monetary payment that the Plan refers to as the "Supplemental Plan Benefit" (singular).

(Doc. No. 41-2, "Advisory Position"). Notably, when referring to "OEMs," the Advisory Position was referring specifically to *automobile manufacturers*.[11] The Advisory Position also stated that unless Plaintiff "provide[d] written confirmation that [she] is not providing products and services to other OEMs, [her] SERP II benefit will be forfeited pursuant to Section 2.3(b) of the Plan." (*Id.*).

In the Answer, Defendants state that via the Advisory Position, "Defendants notified Plaintiff that her request for Plan benefits had been accordingly denied," (Doc. No. 45 at ¶ 8), and the Court accepts as true the assertion of Defendant (the non-movant) that the Advisory Position amounted to a denial; however, the Advisory Position does not premise this denial on Plaintiff not

---

[11] This is clear from the fact that the Advisory Position refers to "Nissan as well as other OEMS such as General Motors, Fiat Chrysler, Porsche, Audi, BMW, and Lexus." (Doc. No. 41-2). Though the Court does not rest its holding on this point, the Court also finds that any conclusion that "OEM" is equivalent to "automobile manufacturer" goes against the plain meaning of the term "OEM." According to Investopedia (which strikes the undersigned as reasonably reliable on this point, and which seems uncontroversial in any event), "OEM" stands for "original equipment manufacturer" and is defined as "a company whose goods are used as components in the products of another company, which then sells the finished item to users." *Original Equipment Manufacturer (OEM)*, Investopedia https://www.investopedia.com/terms/o/oem.asp (last visited August 22, 2022). It would seem that an automobile manufacturer, such as Nissan, thus falls under the category of the "other" (non-OEM) company for purposes of this definition, because the automobile manufacturer is the entity that assembles the parts manufactured by the OEM and sells the finished item to auto dealers (who in turn sell to consumers). This is what Investopedia indicates: "One of the most basic examples of an OEM is the relationship between an auto manufacturer and a maker of auto parts. Parts such as exhaust systems or brake cylinders are manufactured by a wide variety of OEMs. The OEM parts are then sold to an auto manufacturer, which then assembles them into a car. The completed car is then marketed to auto dealers to be sold to individual consumers." *Id.* That is to say, in the context of automobile manufacturing, "[t]he OEM is the original producer of a vehicle's components . . . ." *What Is an Original Equipment Manufacturer (OEM) in the Automotive Sector?*, Investopedia, https://www.investopedia.com/ask/answers/041515/what-original-equipment-manufacturer-oem-automotive-sector.asp (last visited August 22, 2022). The undersigned does not work in this industry, and so perhaps he (and/or Investopedia) could be missing something. But for the reasons just stated, the Court simply does not see how an automobile manufacturer, like Nissan or the others listed in the Advisory Position, could be an OEM.

For this reason, when speaking in its own voice, the Court herein will paraphrase the term "OEM[s]" as "automobile manufacturers." And when its quotes references of the parties—including Plaintiff, who appears to go along with the notion that "OEM[s]" means "automobile manufacturers"— to "OEM[s]," it is with the understanding that the reference is specifically to automobile manufacturers.

being eligible for benefits, but rather on Plaintiff's benefits being subject to forfeiture (unless Plaintiff thereafter provided the specified "written confirmation"). (Doc. No. 41-2).

On May 17, 2019, Plaintiff responded (through counsel) to the Advisory Position with a request for review. (Doc. No. 41-3 at 1).[12] In this response, Plaintiff also objected to Defendants' interpretation of the non-competition provision and responded to Defendants' request for written confirmation that she does not provide products and services to other OEMs:

> Third, to the extent the [Administrative] Committee is concerned that Ms. Vest's particular job duties with Bridgestone involve "rendering services for" other OEMs as Competing Companies, the Committee is mistaken. Ms. Vest's position with Bridgestone is Senior Vice President of Procurement and Strategic Sourcing Partnerships. Her job title alone indicates that her position is focused on the supply-chain for Bridgestone's non-competitive tire manufacturing business, not sales to Nissan or any other OEM. Ms. Vest's job duties consist of sourcing and procuring goods and services for Bridgestone, including raw materials for the production of tires and other rubber products. Vest Aff. ¶¶ 18-19. She has no contact or relationship with any OEM, and cannot be said to "render[] services for" any OEM through her work with Bridgestone. *Id*.

(*Id*. at 3–4).

---

[12] As indicated above, the Claims Procedure contemplates a "review" only of a denial of a claim. Plaintiff takes the view that the Advisory Position does not really contain any "decision" (to deny benefits) such that a request for review of any "decision" (*i.e.*, denial) could be made; thus, Plaintiff states that she submitted this request only "[t]o the extent the Advisory Position is a decision [*i.e.,* denial]." (Doc. No. 41 at 3). The Court notes that if the Advisory Position was in fact not a "denial," Plaintiff arguably prematurely requested a review. But if the Advisory Position was not in fact a denial, it was incumbent upon Defendants to communicate as much to Plaintiff (particularly because the Plan does not mention the possibility of an "advisory position" being a step in the Claims Procedure). So Plaintiff, faced with an "Advisory Position" that was not clearly a denial of her request for benefits, took a reasonable course of action in making a request for a review with the added caveat that such request was being made only to the extent that the Advisory Position was actually a decision (i.e., a decision to deny Plaintiff benefits). In any event, as explained further below, the Court on balance *does* view the Advisory Position to constitute a "denial" such that it was appropriate for Plaintiff to request a review.

The SVPs voted to sustain the denial of Plaintiff's request for Plan benefits, and Defendants thereafter notified Plaintiff of the SVPs' decision. (Doc. No. 45 at ¶ 8).[13] Plaintiff responded by filing the present lawsuit.

B.  Procedural background[14]

Plaintiff brings causes of action for 1) denial of benefits in violation of ERISA, and 2) breach of contract. (Doc. No. 41). Defendants brought a motion to dismiss the case or, in the alternative, to compel arbitration, which the Court denied. (Doc. No. 35). Plaintiff filed the instant Motion, which seeks judgment on the pleadings on Count I of the Amended Complaint for recovery of benefits, under 29 U.S.C. § 1132(a)(1)(B). Plaintiff also seeks via the Motion the voluntary dismissal of Count II (breach of contract) pursuant to Fed. R. Civ. P. 21 as being preempted by ERISA. (Doc. No. 85 at 2).

---

[13] Plaintiff attaches to her Motion a set of e-mails reflecting the SVPs' vote. (Doc. No. 88-1). And although both parties referred to this filing in their briefing on the Motion, this document was neither attached to nor referred to in the Amended Complaint (or, for that matter, the Answer thereto), nor was it attached to the pleadings. Therefore, because the instant Motion is one for judgment on the pleadings, as discussed below the Court cannot consider this document or its contents when ruling on the Motion without converting it to one for summary judgment. *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006). The Court finds it most appropriate to exclude this item, and thus it need not treat the Motion as one for summary judgment.

[14] Also pending before the Court is Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 140). Defendants argue that "the Court's review of a benefits determination must consider the administrative record in accordance with the appropriate standard of review." (Doc. No. 97 at 19). Defendants cite *Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802, 811 (E.D. Tenn. 2009), *McDonald v. W.-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) and *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). None of these cases forbid a district court from ruling on a motion for judgment on the pleadings or require that ERISA claims be handled via a motion for judgment on the administrative record. Instead, they simply set forth the legal standard applicable when the Court is deciding (despite not necessarily being required to decide) a motion for judgment on the administrative record in an ERISA case.

Defendants also argue that Plaintiff engaged in sanctionable behavior merely by filing this motion in the midst of ongoing discovery requests, citing a case that says "repeatedly filing meritless and redundant materials" can be sanctionable. (Doc. No. 97 at 21–22). This argument fails. In the absence of any stay of discovery, Plaintiff has every prerogative and reason continue to prosecute the case, including by conducting discovery, while her Motion remained pending. And as the Court explains below, the present Motion is certainly not meritless.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure provide that after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). To evaluate a defendant's Rule 12(c) motion, the court proceeds as it would on a Rule 12(b)(6) motion; that is, it reviews the complaint in the light most favorable to the nonmoving party, accepts the complaint's well-pled factual allegations as true, and determines whether the moving party is entitled to judgment as a matter of law. *Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). However, in cases like the present one, where the party moving for judgment on the pleadings is the plaintiff rather than the defendant, a somewhat different standard is required. In considering a motion by the plaintiff for judgment on the pleadings, the Court will determine whether "on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *Lowden v. Cty. of Clare*, 709 F. Supp. 2d 540, 546 (E.D. Mich. 2010) (quoting *U.S. v. Blumenthal*, 315 F.2d 351, 352 (3d Cir. 1963) ("[T]he question is whether the facts alleged in the answer are material in the sense that, if proved, they will constitute a legal defense to the plaintiff's claim.")).

As a general rule, if matters outside the pleadings are presented on a Rule 12(c) motion and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). *Max Arnold & Sons, LLC*, 452 F.3d at 503 ("Because Plaintiff presented matters outside of the pleadings with respect to Defendant's Rule 12(c) motion, and because the district court did not exclude these matters, the district court should have converted the Rule 12(c) motion to a motion for summary judgment."). This applies even if the non-excluded material outside the pleadings is not actually relied upon or even considered at all by the court. *See id.*

However, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account" without converting the motion into a summary judgment motion.[15] *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Notably, the Court has not considered any information that would mandate conversion of the instant Motion into one for summary judgment.

## ANALYSIS

Plaintiff argues that she is "entitled to judgment on the pleadings because she was eligible for her SERP II benefits, her benefits vested,[16] and Nissan's SVPs did not vote to deny her benefits

---

[15] Even if exhibits attached to the answer likewise could be considered on a plaintiff's Rule 12(c) motion, that would make no difference here because no exhibits were attached to Defendants' Answer to the Amended Complaint.

[16] The Plan states that the Administrative Committee has discretion to determine "all issues relating to eligibility to participate and *vesting* in accordance with the Plan." (Doc. No. 41-1 at ¶ 7.5 (emphasis added)). The sentence structure here perhaps initially suggests that "[achieving] eligibility" and "vesting" are two distinct requirements for entitlement to benefits under the Plan. But this possibility is refuted by the only other instance in which any variation of the word "vest" (which coincidentally of course happens also to be the last name of Plaintiff) is used. There, the Plan states, "In the case of a Plan termination, each actively employed Participant on the termination date of the Plan, regardless of length of Participation Service, will become vested in his accrued Supplemental Plan Benefit as of the Plan termination date." (*Id.* at ¶ 6.2). This indicates that "becom[ing] vested" is a *status* (a desirable one, from the point of view of a claimant) applicable in the case of Plan termination, rather than a requirement for entitlement to benefits; it also indicates that the concept of "becom[ing] vested" is simply inapplicable in the instant context, which involves no termination of the Plan.

Neither side discusses the meaning or implications of the words "vest[ing]/vest[ed]" as it appears in the Plan, let alone suggest that it is a requirement for entitlement to benefits or otherwise of any significance in deciding the instant Motion. But they do dispute the meaning and implications of the word "eligibility" (and "eligible"), which Court discusses in more detail below.

The Court also notes that as a procedural matter, the Plan requires that eligibility be "confirmed" by the Administrative Committee. More specifically, the Plan refers only to "Participant[s]" being "eligib[le]" to receive Plan benefits, (*id.* at ¶¶ 3.1, 3.2, 3.3), and to be a "Participant," a claimant must not only meet the applicable service requirement, but also be "confirmed as a Participant by the Administrative Committee in writing." (*Id.* at ¶ 2.1(a); *see also id.* at ¶ 1.12). So a "Participant" is an eligible person who has been confirmed as a Participant in writing by the Administrative Committee.

Notably, as the Plan is written, the Administrative Committee does not confirm an eligible person's eligibility. Rather, the Plan without exception refers to the Administrative Committee confirming the person "as a Participant." This is significant because it means that the determination of "Participant" status is

before her benefits were due to be paid. And even if the Court were to review the SVPs' vote, a vendor or supplier, as a matter of law, is not a 'Competing Company' under the Plan." (Doc. No. 88-2 at 8).

Plaintiff's ERISA claim arises under 29 U.S.C. § 1132(a)(1)(B), which provides that an ERISA plan participant or beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Here, Plaintiff moves for judgment on the pleadings and seeks to recover benefits allegedly due to her under the terms of the Plan. The Plan makes clear that a claimant is entitled to receive benefits if she is eligible to receive,[17] and is not disqualified from receiving, benefits. Besides two fleeting and evidently immaterial references to "vesting" (discussed below in a footnote), the Plan refers to no other considerations whatsoever in determining whether a claimant is entitled to benefits; the issues are *eligibility* and *disqualification*, and only eligibility and disqualification.

---

confusingly circular; a person cannot be a Participant unless and until he or she is "confirmed" as such, but he or she simply does not meet the definition of a "Participant" (and thus cannot be "confirmed" as such) unless and until they are "confirmed" as a "Participant" (which should be impossible because he or she is by definition not yet a Participant). As it is actually written, the Plan in this regard is non-sensical—which would not have been the case if it had provided that the Administrative Committee was to confirm the *eligibility of a would-be Participant*, rather than to confirm the status of a mere would-be Participant as a Participant.

In any event, suffice it to say that just as Defendants do not dispute that Plaintiff met the only substantive requirement to be eligible (*i.e.*, the service requirement), they do not assert that the procedural requirement of "confirmation" has not been satisfied; indeed, they do not mention the requirement of confirmation at all. Thus, the notion of "confirmation" plays no role in the Court's analysis herein.

[17] The Court's phrasing here consciously equates "eligibility" with presumptive "entitlement." The Court here is intentionally stating that if someone is "eligible" for benefits within the meaning of the Plan, they are presumptively *entitled* to receive benefits—entitled, that is, unless disqualified from receiving the benefits to which they are otherwise entitled. As discussed below, Defendants dispute the equation of eligibility and (presumptive) entitlement, but the Court finds that the Plan plainly does equate eligibility with presumptive entitlement.

For Plaintiff to prevail on her Motion, therefore, the Court must determine that—based only on the pleadings, as they are properly considered as discussed above, and any other material properly not excluded by the Court as described above—Plaintiff is (a) eligible for benefits; and (b) not disqualified from receiving benefits.

A. Eligibility

The initial question is whether the facts accepted as true for purposes of the Motion (namely, the undenied facts alleged in the Amended Complaint and apparent from the attachments[18] thereto, and all the material allegations of fact in the Answer thereto) show that Plaintiff meets the Plan's eligibility requirements. As explained below, the answer to that question is yes. Moreover, contrary to Defendant's view, "eligibility" to receive benefits means *entitlement* to receive benefits, subject to any Plan-specified grounds for disqualification. Thus, Plaintiff is entitled to receive benefits, absent any circumstances justifying disqualification for benefits under the Plan.

Under the plain language of the Plan, there are two substantive eligibility requirements: 1) that the claimant be a "member of Senior Management of the Company," and 2) that the claimant have completed at least five years of service to the Company (the "Participation Service" requirement).[19] (Doc. No. 41-1 at ¶¶ 2.1(a), 3.1, 3.2; *id.* at 22). The parties agree that Plaintiff was a member of Senior Management and that she had completed more than five years of service to Nissan at the conclusion of her employment with Nissan. (Doc. No. 45 at ¶ 36 ("Defendants admit

---

[18] The Court notes that the authenticity of none of the attachments to the Amended Complaint is in dispute.

[19] As explained in a footnote herein, there is also a procedural requirement for eligibility, *i.e.,* "confirm[ation] as a Participant by the Administrative Committee in writing," but that procedural requirement is immaterial for purposes of the Motion. (Doc. No. 41-1 at ¶ 2.1(a)).

that Plaintiff was a member of Senior Management of Nissan for over five years, making her eligible to participate in the Plan[.]"")).

There is no dispute, then, that by virtue of meeting these requirements (and timely filing a claim for benefits), Plaintiff was "eligible" for *something* under the Plan. When it does speak to what that something is, the Plan describes it in various ways; it refers to "eligib[ility] to participate in this Plan," (Doc. No. 41-1 at ¶ 1.8), "eligib[ility] to become a Participant in the Plan," (*id.* at ¶ 2.1(a), (b)),[20] "eligib[ility] to receive [benefits]," (*id.* at ¶¶ 3.1, 3.2, 3.3),[21] and "eligibility to participate . . . in accordance with the Plan[.]", (*id.* at ¶ 7.5(a)). Ultimately, the language of the Plan suggests two different kinds of "eligibilities": (i) eligibility to be a *Participant/participate in the Plan*; and (ii) eligibility to *receive benefits*. It appears that these two kinds of "eligibilities" are really the same thing (i.e., if someone is eligible to participate in the Plan, then they are eligible to receive benefits, and vice versa).[22] Indeed, the Court does not perceive where the Plan contemplates any kind of "participation" other than "participation" via the reception of benefits— *i.e.,* to be eligible to "participate in the Plan" is to be eligible to participate in the reception of

---

[20]For example, the Plan here states, "[a] member of Senior Management of the Company (as defined in Exhibit I) is eligible to become a Participant in the Plan; provided that such employee is confirmed as a Participant by the Administrative Committee in writing." (Doc. No. 41-1 at ¶ 2.1(a)).

[21] For example, the Plan here states, "[e]ach Participant, after meeting the Participation Service requirement set forth below, is eligible to receive a Supplemental Plan Benefit under the Plan upon the Participant's Retirement or other Separation from Service." (*Id*. at ¶ 3.1).

[22] Regarding the first kind of eligibility suggested by the Plan, one's eligibility to be a Participant under the Plan, the Plan states that the Administrative Committee's role is to simply "confirm" that the individual has met the condition set forth in Exhibit I (i.e., is a member of Senior Management). Here, it is undisputed that Plaintiff met this condition set forth in Exhibit I; thus, Plaintiff was eligible to be a Participant in the Plan (and any contrary decision made by Defendants would have been an irrational one). This conclusion appears to be uncontroversial; the Court takes Defendants' argument to be directed not at this issue of whether Plaintiff was eligible to be a *Participant* in the Plan, but instead whether she was eligible to *receive benefits*.

benefits under the Plan. But given the crux of the dispute in this case,[23] the Court will speak in terms of the latter—eligibility *for benefits*—and will focus its analysis on the question of what it means to be "eligible" for benefits under the Plan.

The Parties disagree about what it means for a claimant to be "eligible" for benefits. According to Plaintiff, it means that she was *entitled* to receive benefits on April 1, 2019 (the first day of the month falling six months after her last day of work on September 21, 2018). (Doc. No. 88-2 at 10). According to Defendants, it does not mean that she was automatically entitled to receive benefits. (Doc. No. 97 at 12 ("[T]he fact that Ms. Vest was 'eligible' to participate in the SERP II does not automatically 'entitle' her to SERP II benefits. The SERP II unambiguously states that a participant is 'eligible' to participate in the SERP II if she is 'a member of Senior Management of the Company' and has attained five years of service. (Plan Document at 9, 12, 22; Sections 2.1(a), 3.1, 3.2, Exhibit I.) The Plan does not say, as Ms. Vest repeatedly and erroneously suggests, that eligible means entitled. (See Plan Document.)")).

The Court rejects Defendants' interpretation of the word "eligible" as it applies to a claimant's "eligibility" to receive benefits. In the Court's view, the only rational interpretation of the Plan is that an individual who meets the Plan's eligibility requirements receives Plan benefits (subject to a timely SVP vote).[24] In particular, the absence of any additional procedures or criteria for receiving benefits under the Plan demonstrates that the only reasonable interpretation of the word "eligible," as it is used in the Plan to describe "eligib[ility]" to receive benefits, is that the

---

[23] Ultimately, and in practical terms, this case is about whether Plaintiff was wrongfully denied *benefits*, not whether she was wrongfully not deemed "eligible."

[24] To be clear, under the Plan, "eligible" persons can still be denied benefits if they are subject to forfeiture of those benefits pursuant to Section 2.3(b) (or, for that matter, Section 7.1 of the Plan, which prescribes additional grounds for forfeiture).

individual is presumptively (*i.e.*, barring some disqualifying factor such as, for example, violation of the non-competition provision) entitled to receive benefits. Defendants state that the[25] definition of "eligible," according to Merriam-Webster, is "qualified to participate or be chosen." (Doc. No. 97 at 13 n.6). But after applying this definition, the question still remains: what does it mean to be "qualified," and if someone is "qualified," does that make them "entitled" to benefits? It would make little sense if a claimant "eligible" for benefits were deemed merely "qualified to . . . *be chosen*" for benefits, when the Plan provides no criteria or guidance as to how or why such eligible claimant would be "chosen" to receive benefits. That is to say, the Plan in no way contemplates the selection, from the set of all claimants eligible to receive benefits, of a subset of (very fortunate) eligible claimants who actually will receive benefits. Additionally, just as Plaintiff suggests, "eligible" is a synonym for "entitled," making it reasonable to use the words interchangeably. *Entitled*, *Roget's 21st Century Thesaurus, Third Edition*, https://www.thesaurus.com/browse/entitled.

Here, because Plaintiff met the eligibility requirements and timely filed a claim as outlined in the Claims Procedure, she was entitled to receive benefits as a lump sum in April 2019. (Doc. No. 41-1 at ¶ 3.4 ("Such lump sum shall be paid on via executive payroll during the month following the six month anniversary of the last day worked."), Doc. No. 41 at ¶ 16 ("[Plaintiff] served in that role until her resignation, effective September 21, 2018.")).

Defendants' Answer supports this position. In the Answer, Defendants state, "Defendants admit that Plaintiff was a member of Senior Management of Nissan for over five years, making

---

[25] Defendants also present Merriam-Webster's second definition of "eligible"—"worthy of being chosen." (Doc. No. 97 at 13 n.6). But Merriam-Webster makes clear that this second definition is not applicable here, when it uses the phrase "an eligible young bachelor" to illustrate the applicability of this definition. https://www.merriam-webster.com/dictionary/eligible (last visited August 11, 2022).

her eligible to participate in the Plan, but she is no longer entitled to Plan benefits. Plaintiff forfeited those benefits when she resigned from NNA and accepted employment with a company that competes with it." (Doc. No. 45 at ¶ 36). Thus, Defendants did not merely admit that Plaintiff is eligible for benefits, but also plainly implied[26]—in stark and unexplained contrast to their current position—that the effect of her eligibility was that it made her *entitled* to receive benefits (subject to the possible forfeiture of such benefits, a topic that the Court discusses below).

To be clear, as discussed elsewhere herein, the Court recognizes that to the extent that the Administrative Committee is vested with the authority to interpret the Plan's provisions regarding eligibility, the Court would need to defer to the Administrative Committee's interpretation as to eligibility. But the Court does not perceive that Defendants made any adverse findings (or indeed any findings at all) regarding Plaintiff's eligibility for benefits; therefore, there is no "review" (under either a *de novo* or arbitrary and capricious standard) for the Court to conduct here on the issue of Plaintiff's eligibility. Though the Court views the Advisory Position as a "denial," it is not a denial based on a lack of eligibility; the Court does not see where the Administrative Committee (or anyone else) ever has interpreted the Plan to deem Plaintiff not eligible. Rather, the basis for the denial via the Advisory Position was the alleged *disqualification* under Section 2.3(b) of the Plan ("the non-competition provision"). Therefore, the Court finds, without needing to conduct any "review" of any determination by Defendants (because there was no determination by Defendants on the issue of eligibility), that as a matter of law, Plaintiff is eligible for (entitled to) benefits unless any grounds for disqualification apply.

---

[26] By contending that Plaintiff was "eligible" and yet "no longer entitled" to benefits (due to her acceptance of employment that supposedly effected forfeiture), Defendants unmistakably imply that she *had been* entitled to benefits by virtue of being eligible, prior to her acceptance of such employment.

B. Disqualification (forfeiture)[27]

Defendants argue that Plaintiff forfeited her benefits under the non-competition provision when she accepted employment with Bridgestone. Defendants, on two occasions and via two separate decision-making bodies, issued a denial of Plaintiff's benefits on the basis that she forfeited her benefits due to her (alleged) violation of the non-competition provision; first, the Administrative Committee's denial[28] set forth in the Advisory Position (the "initial denial"), and second, the SVPs' vote "to sustain the denial."[29] (Doc. No. 45 at ¶ 8). The Court will review each of these denials in turn, applying the relevant standard of review.

_____

[27] The Court uses the terms "forfeiture" and "disqualification" interchangeably to refer to a denial of benefits based on the grounds set forth in Section 2.3(b), whereby "if the Participant is found by a majority vote of the Senior Vice Presidents of the Company to have violated in any way the restrictions and requirements [set forth in Section 2.3(b)] . . . then the Company . . . will have no further obligation to make any payment of any benefit deemed accrued hereunder to the Participant[.]" In other words, if the claimant is found to have violated Section 2.3(b), then the otherwise eligible claimant is disqualified from receiving benefits, or the claimant has forfeited his or her benefits.

[28] The Court previously held that the April 5, 2019 Advisory Position constitutes an "initial determination" (i.e., a decision of denial of benefits). (Doc. No. 34 at 14–15 n.9 ("the Court finds that a decision of denial was reached with the initial advisory position, pursuant to Claims Procedure Subsection 7.12(d).")). The Court adheres to that decision for purposes of the instant Motion, not least because it is consistent with the position that the non-movants (Defendants) have taken for purposes of the instant Motion. (Doc. No. 97 at 9). The Court notes, though, that this was an improper denial because, among other things (discussed further below), it was made by the wrong person (because only the SVPs are entrusted with the ability to enforce Section 2.3(b) of the Plan).

[29] Setting aside the issue of "eligibility," the "initial denial" violates the Claims Procedure set forth in the Plan. The Advisory Position's denial is based primarily on its position that Plaintiff violated Section 2.3(b). As the Court explained above and in its prior memorandum opinion denying the motion to dismiss, Section 2.3(b) of the Plan (the provision pursuant to which Defendants claim the Administrative Committee had authority to make the initial denial) is not part of the Claims Procedure and can be invoked only by the SVPs. And even if the Administrative Committee did have the authority to make the initial denial, it also failed to follow the procedures outlined in the Plan because the SVPs had not (at the time of the initial denial) taken a vote on the issue, as required by Section 2.3(b). (Doc. No. 41-1 (requiring "a majority vote of the Senior Vice Presidents of the Company")). Therefore, the initial denial violated the plain terms of the Plan. Had the SVPs' failure to take a vote prior to the initial denial been the only issue here (a purely "procedural" violation), the Court would have simply remanded this case to the Plan's administrator (as explained in more detail in the "Benefits" section below). *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009) ("[A] procedural violation does not warrant the substantive remedy of awarding benefits[.]"). But because the Court also finds herein that the denial of benefits itself

a. *Standard of review*[30]

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary[31] discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Thus, while the default standard for reviewing a denial of benefits under ERISA is *de novo*, when the plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan," then the deferential "arbitrary and capricious" standard applies. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 n.4 (6th Cir. 1998).

---

was improper (and not just the procedures by which the claim was denied), the Court will award Plaintiff benefits.

[30] In conjunction with their discussion of the proper standard of review, the parties discuss whether the Plan is a top hat plan or a garden variety ERISA plan. But neither party offered any reason as to why this distinction would be material for purposes of ruling on the Motion, and the Court cannot independently discern any reason. Thus, the Court will not undertake an extensive discussion of this topic. The Court previously held that the Plan is "likely" a top hat plan. (Doc. No. 34 at 10–11). Defendants argue that it is a top hat plan and Plaintiff accepts this premise for purposes of the Motion. Thus, for what it is worth, the Court accepts the (seemingly immaterial) notion that the Plan is indeed a top hat plan.

[31] Under the Plan, the "administrator or fiduciary" is the NNA Retirement and Savings Committee, referred to in the Plan and by the Court herein as the "Administrative Committee." (Doc. No. 41-1 at ¶ 1.2). The Plan states,

> Administrative Committee means the NNA Retirement and Savings Committee (as Administrator of Nissan North America's qualified retirement plans) appointed by the Board of Directors of Nissan North America, Inc., with the powers and duties described in this Plan and in the Trust Agreements. The NNA Retirement and Savings Committee may delegate its administrative responsibilities to a Supplemental Executive Retirement Plan (SERP) subcommittee, all members of which shall be voting members of the NNA Retirement and Savings Committee.

(*Id.*). Thus, when the parties refer to the "SERP Administrative Committee" or the "SERP Committee," they are really referring to a subcommittee of the Administrative Committee. For ease of reference in this opinion, and because it appears to the Court to be immaterial for purposes of the Court's analysis whether certain actions were taken by the Administrative Committee or a subcommittee thereof, the Court will refer to the Administrative Committee and any subcommittees of the Administrative Committee simply as the "Administrative Committee."

Here, the Plan gives the Administrative Committee "sole discretion" to enforce, interpret, and construe the Plan. (Doc. No. 41-1 at ¶ 7.5). Therefore, a denial of benefits made by the Administrative Committee is (generally speaking) subject to review under the arbitrary and capricious standard. However, the denial by the Administrative Committee here (as set forth in the Advisory Position), was made pursuant to provisions of the Plan—regarding disqualification—that the Administrative Committee is not vested with the authority to enforce, under the Plan's plain terms. The Advisory Position clearly indicates that the Administrative Committee's denial was based on the non-competition provision of Section 2.3(b) of the Plan. The Advisory Position describes the non-competition provision, makes a statement about how the Administrative Committee "historically" has applied the non-competition provision, and then states that "the [Administrative] Committee has decided that under the terms of the SERP II, you are not permitted to work for a vendor that provides products to multiple automotive OEMs and collects SERP II benefits." (Doc. 41-2). The Advisory Position concludes by informing Plaintiff that her benefits "will be forfeited pursuant to Section 2.3(b) of the Plan" unless she provides confirmation that she is not in violation of the non-competition provision, as interpreted by the Administrative Committee. (*Id.*). In the Answer, Defendants confirm that the denial contained in the Advisory Position was based on a purported violation of the non-competition provision. (Doc. No. 45 at ¶ 8 ("… Plaintiff is not entitled to receive any Plan benefits because she violated her agreement not to work for a company that competes with NNA. On April 5, 2019[, the date on which the Advisory Position was issued to Plaintiff], Defendants notified Plaintiff that her request for Plan benefits had been accordingly denied.")). Thus, the Court finds that the Administrative Committee issued its denial (via the Advisory Position) based on the non-competition provision of Section 2.3(b) of the Plan.

Under the Plan, however, *only the SVPs* are entrusted with the authority (exercisable upon majority vote) to find a that a claimant is disqualified from receiving benefits under Section 2.3(b). (Doc. No. 41-1 at ¶ 2.3(b)). Therefore, because the Administrative Committee was not authorized to make the determination of disqualification under Section 2.3(b) of the Plan, a *de novo* standard of review applies to its denial of Plaintiff's benefits based on such disqualification.[32] *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 596 (6th Cir. 2001) (the court reviews *de novo* decisions governed by ERISA that are made by an unauthorized body); *Parkridge Med. Ctr., Inc. v. CPC Logistics, Inc. Grp. Ben. Plan*, No. 1:12-CV-124, 2013 WL 3976621, at *6 (E.D. Tenn. Aug. 2, 2013) (applying *de novo* review when an entity other than the entity with sole discretion to interpret plan documents "communicated with [the claimant] regarding its claim, issued the decision letter, [and] considered the appeal"); *Wintermute v. The Guardian*, 524 F. Supp. 2d 954, 960 (S.D. Ohio 2007) ("ClaimSource is an unauthorized body without discretionary authority to terminate benefits under the plan, [so] its decision to terminate [Plaintiff's] disability benefits receives de novo review.").

The SVPs' vote to deny Plaintiff benefits, however, is subject to the arbitrary and capricious standard of review because the Plan gives the SVPs the authority to vote to determine any violation of the non-competition provision in Section 2.3(b) (which, therefore, necessarily carries with it the discretion to interpret and apply the terms of Section 2.3(b)). Therefore, when

---

[32] Defendants argue that because the Plan generally gives the Administrative Committee discretion to interpret the Plan, the deferential arbitrary and capricious standard of review should apply to the Administrative Committee's denial regardless of the fact that the denial was based on a purported violation of Section 2.3(b). (Doc. No. 97 at 10-11). Though the Court disagrees with this position, as described herein, even under an arbitrary and capricious standard of review, Plaintiff would prevail, as the Court goes on to explain. Thus, Plaintiff's Motion would be granted even if the arbitrary and capricious standard of review applied to the Administrative Committee's decision.

reviewing the SVPs' vote to sustain the denial of Plaintiff's benefits, the Court will apply the arbitrary and capricious standard of review.[33]

### b. *The initial denial*

The Court begins by reviewing the Administrative Committee's denial of Plaintiff's benefits (set forth in the Advisory Position), undertaking the more stringent, less deferential *de novo* review. In applying the *de novo* standard of review in an ERISA action, the court's role is to

---

[33] Plaintiff points out that the Court determined in a related case (involving the same Plan) that *de novo* review is appropriate when considering decisions made by the SVPs because the Plan does not give the SVPs interpretative authority:

> Nevertheless, it is relevant that the document Defendants identify as announcing a "decision" indicates that the SVPs of Nissan—and not the Administrative Committee—voted to find Plaintiff ineligible to receive benefits. The Plan nowhere equates the SVPs with the Administrative Committee, and there is no indication that the SVPs are delegated the Administrative Committee's discretion under the Plan. In fact, in referring to the "sole discretion" of the Administrative Committee to determine issues relating to eligibility to participate in the Plan and to determine the amount and kind of benefits payable to claimants, the Plan indicates that the SVPs affirmatively lack such discretion. The Court has previously discussed the confusion regarding the role of the SVPs in the Claims Process and has indicated that their involvement in the Claims Procedure is not contemplated by the Plan.

> Defendants have failed to carry their burden of showing the Court that they are entitled to arbitrary and capricious review, because it is apparent that an entity other than the Administrative Committee [was] exercising (or at least purporting to exercise) the discretion referenced in the Plan. As a result, the Court finds that it should undertake a de novo review when construing the Plan document.

*Delauter v. Nissan Supplemental Exec. Ret. Plan II*, No. 3:20-CV-00609, 2021 WL 2515238, at *10 (M.D. Tenn. June 18, 2021) (Richardson, J.). Plaintiff's point is well taken. Here, while the Plan gives the SVPs authority to conduct a vote on the issue of whether a claimant has violated the non-competition provision of Section 2.3(b), the Plan does not explicitly give the SVPs authority to interpret or construe the Plan. *See Daul v. PPM Energy, Inc.*, No. CV 08-524-AC, 2009 WL 2496333, at *2 (D. Or. Aug. 14, 2009) ("[P]lan terms which merely identify the administrator's tasks but bestow no power to interpret the plan are insufficient to confer discretionary authority on the administrator.") (citing *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001)). Defendants should have been more explicit in granting the SVPs discretion to interpret the Plan via the voting procedure set forth in Section 2.3(b). However, the Court finds the most reasonable interpretation of the Plan is that, by entrusting the SVPs with the ability to vote under Section 2.3(b), the Plan necessarily granted the SVPs discretion to "interpret" relevant provisions of Section 2.3(b)—*i.e.*, make a decision as to what those provisions mean, in the course of determining whether, given their proper meaning, they dictate disqualification of a claimant. That being said, for the reasons set forth below, Plaintiff prevails whether the Court applies the *de novo* standard of review or the arbitrary and capricious standard of review.

determine whether the plan administrator made the correct decision in denying benefits. *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002). On *de novo* review, "[t]he administrator's decision is accorded no deference or presumption of correctness. The review is limited to the record before the administrator[,] and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* at 809 (citation omitted), The "*de novo* standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins*, 150 F.3d at 613 (*citing Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir. 1997)). Additionally, "[u]nder general contract principles, where the Court is conducting a *de novo* review, 'any ambiguities in the language of the plan [must] be construed strictly against the drafter of the plan.'" *Heimer v. Companion Life Ins. Co.*, No. 1:15-CV-338, 2016 WL 10932755, at *4 (W.D. Mich. Aug. 12, 2016), aff'd, 879 F.3d 172 (6th Cir. 2018) (*citing Regents of Univ. of Mich. v. Emps. of Agency Rent–A–Car Hosp. Ass'n*, 122 F.3d 336, 340 (6th Cir. 1997)). The Court therefore can (and will) construe any ambiguities in the Plan against the drafter (Defendants) when considering issues implicated by the determination made by the Administrative Committee related to Section 2.3(b).

Under Section 2.3(b), a claimant's benefits are forfeited if she "accepts any position as an employee of or a consultant to any Competing Company." (Doc. No. 41-1 at ¶ 2.3(b)). A "Competing Company" is defined in the Plan as "any business or organization . . . with which the Company competes, including but not limited to a business that manufactures, assembles, imports, distributes, and/or sells passenger automobiles and/or light trucks and/or light commercial vehicles, and/or a business which is engaged in automotive finance and related services, except for such a company or organization that is owned, directly or indirectly, by Nissan Motor Co., Ltd., or Renault. . . . ." (*Id.*).

As noted above, the Court views the Administrative Committee to have determined (as stated in the Advisory Position) that Plaintiff was disqualified from receiving benefits because she had violated Section 2.3(b). This determination is incorrect because Bridgestone simply is not a "Competing Company," as defined in the Plan, as is plainly required for disqualification under section 2.3(b).

"Competing Company" is defined primarily as "a[] business or organization . . . with which the Company competes." (Doc. No. 41-1 at ¶ 2.3(b)). It would require an unreasonable construction of the Plan's term "competes" to say that a tire manufacturer "competes" with an automobile manufacturer like Nissan; Defendants admit that Bridgestone sells tires, not automobiles, and nothing in the Plan indicates that a supplier of automotive parts would be considered the type of company that competes with Nissan.

Defendants emphasize the phrase in Section 2.3(b) "included but not limited to," and argue that, "[a]dmittedly, the [Plan] document does not spell out every company that may be a 'Competing Company,' but it's not required to, and doing so would be impractical." (Doc. No. 97 at 22). The Court does not disagree with Defendants here, but ultimately that makes no difference. The Court's conclusion that the Administrative Committee's denial was necessarily the result of an untenable construction of the Plan does not rest on a restrictive view of the phrase "including but not limited to"; instead, it is based on the Plan's primary definition of "Competing Company" as one "with which the Company competes." As Plaintiff aptly points out:

> The catch-all "including but not limited to" merely illustrates (and does not expand) the category of "any business or organization with which the Company competes." And there is no allegation that Nissan competes with Bridgestone . . . .

(Doc. No. 102 at 6). To the contrary, as Plaintiff further notes:

> the Administrative Committee determined that Bridgestone "manufactures tires for OEMs and the aftersales markets, and supplies tires for new vehicles to Nissan as

well as other OEMs." It defies logic that Nissan would purchase tires from a company with which it competes.

(*Id.*) (citation omitted). Had Defendants wished to include a company such as Bridgestone as a Competing Company, they could have done so by writing the definition in the Plan in such a way that clearly includes manufacturers of products for other automobile manufacturers. *See Jones*, 385 F.3d at 661 (6th Cir. 2004) ("[The insurer] could have expressly included such a requirement.").

Despite Defendants' post-facto insistence that Bridgestone was a Competing Company for purposes of Section 2.3(b), that was not actually the basis for the Administrative Committee's decision according to the Advisory Position. True, the Advisory Position did quote the definition of "Competing Company" and note that working for one was grounds for disqualification under Section 2.3(b). (Doc. No. 41-2). But it did not then assert that Bridgestone was a "Competing Company." Instead, the Advisory Position asserted a different reason for disqualifying Plaintiff from receiving benefits under Section 2.3(b): that Plaintiff violated some purported requirement (for avoiding disqualification) that claimant's post-Nissan employment **not be with "vendors that provide products or services to multiple automotive OEMs,** *unless their work related exclusively to Nissan/Infiniti or Nissan/Infiniti dealers.*" (*Id.*) (emphases added). More specifically, after stating the purported requirement, the Advisory Position tacitly assumed (apparently with justification) that Bridgestone was a vendor "that provide[s] products or services to multiple automotive OEMs," then asserted (albeit not in the clearest of terms) that apparently Plaintiff's work at Bridgestone was not exclusively with or for the benefit of Nissan/Infiniti; on this basis, the Advisory Position effectively denied her claim for benefits (subject to "appeal"). (*Id.*). But this purported requirement is not found in the Plan, which nowhere prescribes the general rule (set forth in bold above) that provides (subject to the exception noted in italics above) for

disqualification if the claimant provides products or services to multiple automobile manufacturers. And the Administrative Committee cannot simply conjure up a ground for forfeiture not included in the Plan, especially considering that the Plan does not even give the Administrative Committee authority to determine forfeiture under Section 2.3(b). Had Defendants wanted to include violation of the above-stated purported requirement as grounds for forfeiture, Defendants could and should have included such a requirement. They did not.

In short, the Court concludes that a tire manufacturer such as Bridgestone is simply not a "Competing Company" as defined by the Plan, as is actually required to disqualify Plaintiff under the non-competition provision of Section 2.3(b). The Court further finds that the purported grounds for disqualification relied on by the Administrative Committee simply do not exist; they are not cognizable grounds for forfeiture under the Plan. Thus, the Court finds, on *de novo* review, that the Administrative Committee's determination that Plaintiff had forfeited her benefits based on Section 2.3(b) was incorrect, and thus Plaintiff is not disqualified from receiving her benefits.[34]

c. *The SVPs' vote*

The determination that Plaintiff forfeited her benefits when she began working for Bridgestone in violation of Section 2.3(b) is not only incorrect under a *de novo* standard of review,

---

[34] Throughout their brief, Defendants also contend that "Ms. Vest admits that there were "legitimate business reasons" to find that Bridgestone is a "Competing Company." (Doc. No. 97 at 15 n.10). But Defendants cite no authority, and provide no explanation as to why it matters that there (supposedly) were legitimate business reasons" for this finding. Further, Defendants misquote Plaintiff, who actually states only that "Nissan's Director of Legal and Assistant General Counsel notes legitimate business reasons for Nissan not wanting its executives to work for a vendor or supplier. Vest does not contest these reasons." (Doc. No. 88-2 at 15 n.10). As Plaintiff puts it, "whether the company has a legitimate business interest in preventing its executives to work for a supplier or vendor is not relevant to the substantive question in interpreting the Plan.")." (Doc. No. 102 at 5-6). It is one thing to say that the company has legitimate reasons to prefer that its departing executives not work for a vendor or supplier of the company. It is quite another to say that the company had legitimate business reasons for deeming a particular term in the Plan applicable under particular circumstances. The Court thus does not herein consider the existence or non-existence of the alleged "legitimate business reasons."

but is also arbitrary and capricious. "An ERISA benefit plan administrator's decisions on eligibility[35] for benefits are not arbitrary and capricious if they are rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (internal quotation marks and citations omitted). The Court realizes that the arbitrary and capricious standard of review is a relatively deferential standard, since mere *rationality* (vis-à-vis plan provisions) is not a high bar for a decision to clear. And yet the SVPs' decision nevertheless fails to clear it.

Unlike the Administrative Committee, the SVPs are provided by the Plan the authority to vote on a claimant's purported violation of the non-competition provision of Section 2.3(b). Thus, as described above, the Court views the Plan as giving the SVPs limited discretion to interpret Section 2.3(b)—as opposed to other sections—of the Plan. But this discretion does not render the SVPs' vote to sustain the Administrative Committee's denial of benefits under Section 2.3(b)[36] *rational* in light of the Plan's plain terms. Rather, consistent with the discussion above regarding the Administrative Committee's vote, the SVPs' vote to sustain the forfeiture of Plaintiff's benefits was irrational. As explained, Bridgestone (a tire manufacturer and supplier) does not meet the

---

[35] This standard applies not only to decisions on eligibility for benefits, but also to decisions regarding disqualification from receiving benefits under an ERISA plan.

[36] Perhaps stating the obvious, the Court makes clear that it accepts as true, and the parties do not appear to dispute, that the SVPs' vote was based on Section 2.3(b). The Court need not rely on any filings outside of the pleadings to make this determination because the Answer states that the SVPs voted to "sustain the denial of Plaintiff's request for Plan benefits"—a denial that was made by the Administrative Committee "because she violated her agreement not to work for a company that competes with NNA." (Doc. No. 45 at ¶ 8).

The Court also mentions here that Section 2.3(b) of the Plan does not contemplate the SVPs voting to "sustain" (or, conversely, overrule) a determination previously made by the Administrative Committee regarding the non-competition provision. The Court views this to be a violation of the procedures set forth in the Plan, and notes that this procedural violation has possible substantive implications. That is, it appears by virtue of Defendants using the term "sustain" that the SVPs did not entirely independently vote to deny Plaintiff benefits, but instead were first presented with the Administrative Committee's determination on the issue.

definition of Competing Company set forth in the Plan, as would be required for Plaintiff's employment with Bridgestone to constitute grounds for forfeiture under the non-competition provision of Section 2.3(b). In order to consider Bridgestone a "Competing Company," the SVPs would have had to interpret the word "competing" in an manner that is irrational because goes against its plain meaning.

In any event, there is nothing to indicate that the SVPs' vote to disqualify Plaintiff was actually based on Bridgestone fitting within the definition of "Competing Company." And to the extent that the vote to disqualify Plaintiff under Section 2.3(b) was based on (alleged) grounds for disqualification—other (alleged) barriers to Plaintiff retaining her presumptive eligibility to receive benefits—that would be plainly outside the SVPs' authority. *See Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) ("Discretion to interpret a plan, however, does not include the authority to add eligibility requirements to the plan."). It thus would have been, in a word, irrational. So to the extent that the SVPs' denial was based on the same illusory grounds for forfeiture that the Administrative Committee invented—as Defendants' Answer suggests it may have been (Doc. No. 45 at ¶ 8)—the decision would be irrational. In short, to be something other than arbitrary and capricious, the SVPs' vote would have had to have been based on a rational view that Bridgestone was a Competing Company. And the current record reveals that even if the SVPs had concluded that Bridgestone was a Competing Company—which seems unlikely, given the rationale of the decision they were reviewing—such a conclusion would have been entirely without basis and thus irrational.

Therefore, the Court finds that the SVPs acted arbitrarily and capriciously when voting to sustain the denial of Plaintiff's benefits based on Section 2.3(b) of the Plan.

d.  *Conclusion*

As described herein, the Court finds based on the uncontroverted facts of the Amended Complaint (and the attachments thereto) and Defendants' Answer alone, that (a) Plaintiff is "eligible," meaning presumptively entitled to benefits, under the Plan, and (b) Plaintiff is not disqualified from receiving those benefits to which she is entitled absent disqualification. The Court thus finds that Plaintiff has met her burden of showing that she is entitled to judgment as a matter of law, based solely on what the Court can properly consider under Rule 12(c), and her Motion will be granted.

C.  Remedy

The Court has discretion to determine the appropriate remedy for Defendants' erroneous denial of benefits. *Shelby Cnty. Health Care Corp.*, 581 F.3d at 372 ("An appellate court reviews a district court's choice of remedy in an ERISA action for abuse of discretion."). As the Sixth Circuit in *Shelby Cnty. Health Care Corp.* explained,

> Where a district court determines that the plan administrator erroneously denied benefits, a district court "may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 621 (6th Cir. 2006); *DeGrado v. Jefferson Pilot Fin. Ins. Co.,* 451 F.3d 1161, 1175 (10th Cir. 2006) (stating that a district court has two options after determining that a denial of benefits was improper: "it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits") (internal quotation marks omitted); *see also* 29 U.S.C. § 1132(a)(1)(B) (establishing the right of plan participants who bring suit pursuant to ERISA "to recover benefits due to him under the terms of his plan").

> [. . .]

> In contrast, where "there [was] no evidence in the record to support a termination or denial of benefits," an award of benefits is appropriate without remand to the plan administrator. *E.g., DeGrado,* 451 F.3d at 1176; *see Helfman v. GE Group Life Assurance Co.,* 573 F.3d 383, 396 (6th Cir. 2009) (ordering remand to the plan administrator after determining that the record did not "clearly establish[]" that the claimant was entitled to benefits).

581 F.3d at 373-74.[37]

As explained by one district court, a retroactive award of benefits is preferred in some circumstances:

> In an ERISA benefits case, a court has discretion in fashioning a remedy. Upon finding that a plan administrator has not reached a correct decision under a de novo standard, a court may either remand the case to the administrator for a re-evaluation of the claim or retroactively award benefits. In crafting a remedy, however, the Court must remain cognizant of the fact that ERISA promotes the interests of employees and other plan beneficiaries by protecting employees' contractually defined benefits. "Allowing a plan administrator another opportunity to reenforce its conclusion after many months and several layers of administrative proceedings during which it had ample time to conduct the necessary evaluation would undermine these underlying policies of ERISA." Thus, remand is unnecessary where the claimant would have received benefits had the correct review been performed.

*Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 266 (E.D. Pa. 2016) (footnotes and citations omitted). See also *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 246 (1st Cir. 2006) (an award of benefits, rather than remand, is appropriate where the evidence "compels the conclusion that [the plaintiff] is entitled to benefits.").

Further, some courts have held that remand is *always* an inappropriate remedy where the court has engaged in a *de novo* review and thus has made its own independent determination on the issue of a plaintiff's entitlement to benefits:

> Where the *de novo* standard applies, the court is required to make "an independent determination of the issue." *See United States v. First City Nat'l Bank*, 386 U.S. 361, 87 S. Ct. 1088, 18 L.Ed.2d 151 (1967) (holding that "review de novo" means "that the court should make an independent determination of the issues"). Remand cannot be an appropriate remedy where the court has already made its own independent determination.
>
> "When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made

[37] Here, the relevant "plan administrator" appears to be the Administrative Committee. (See Doc. No. 41-1 at ¶ 1.2 ("Administrative Committee means the NNA Retirement and Savings Committee (as Administrator of Nissan North America's qualified retirement plans) appointed by the Board of Directors of Nissan North America, Inc[.]")).

a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (citation omitted). For ERISA benefits claims, *de novo* "standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision." *Id.* at 833. Rather, "it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.*; *see also Ray v. UNUM Life Ins. Co. of Am.*, 244 F. App'x 772, 782 (9th Cir. 2007) (unpublished) (approving of district court's application of preponderance of evidence standard).

*David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021).

As described above, the Court finds herein that 1) Plaintiff was entitled to receive benefits, and 2) Plaintiff was not disqualified from receiving benefits and the Administrative Committee's determination otherwise was incorrect under a *de novo* standard (and the SVPs' vote otherwise was arbitrary and capricious). In other words, the Court has reached an independent determination that Plaintiff is entitled to benefits, and no evidence here supports a denial or forfeiture of Plaintiff's benefits. Thus, remand is unwarranted and the Court views the most appropriate relief to be an award of benefits to Plaintiff without remand to the Administrative Committee.

Plaintiff also requests an award of prejudgment interest (measured "from the date that [Plaintiff] was entitled to have her benefits paid to the date of the Court's judgment") and postjudgment interest (measured "from the date of the Court's judgment to the date that the benefits are paid."). (Doc. No. 41 at 11). "As a matter of equity, the district court has the discretion to award prejudgment interest in ERISA cases." *Pinckney v. Blue Cross Blue Shield of Tennessee, Inc.*, No. 3:05-00962, 2007 WL 108886, at *9 (M.D. Tenn. Jan. 9, 2007) (citing *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998)). The Court finds that equity requires awarding Plaintiff prejudgment interest to give Plaintiff the full value of her lost benefits. Awarding prejudgment interest in this matter would incentivize Defendants to conduct themselves in a manner that accords with the procedures set forth in the Plan for evaluating one's eligibility for

benefits. *See Warden v. Metro. Life Ins. Co.*, 574 F. Supp. 2d 838, 850 (M.D. Tenn. 2008) ("Not to award prejudgment interests, would render breaches of the Plan profitable.").

Additionally, an award of postjudgment interest is required. As the Sixth Circuit has explained,

> Under 28 U.S.C. § 1961, district courts are required to award postjudgment interest. The statute provides that "[s]uch interest shall be calculated from the date of the entry of the judgment," and "shall be computed daily to the date of payment." 28 U.S.C. § 1961(a), (b). The statute "mandates the imposition of post-judgment interest, thus removing the award of such interest from the discretion of the District Court." *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989 (6th Cir. 1982). The federal postjudgment interest statute allows interest on "all money judgments," including those in ERISA cases. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 810 (6th Cir. 2002).

*Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002). Thus, Plaintiff will be awarded postjudgment interest.

Finally, Plaintiff will be awarded reasonable attorneys' fees. The Sixth Circuit has set forth six factors for a district court to consider upon request for an award of attorneys' fees in an ERISA matter,

> Under 29 U.S.C. § 1132(g)(1) a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must consider the following factors in deciding whether to award attorney fees, (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust*, 203 F.3d 926, 936 (6th Cir. 2000). The Court's observations above regarding prejudgment interest also support an award of attorneys' fees. Defendants' failure to comply with the procedures set forth in the Plan, Defendants' incorrect denial of benefits, and the clear merit of Plaintiff's

position (and countervailing lack of merit in Defendants' position) discussed herein also weigh in favor of awarding attorneys' fees. This award will discourage future erroneous decisions by Defendants related to the Plan, and will benefit other Plan participants via the ruling attained by Plaintiff. *See Powell v. Premier Mfg. Support Servs., Inc.*, No. CIV.A. 1-05-0012, 2006 WL 1529470, at *10 (M.D. Tenn. June 1, 2006) ("An award of attorney fees would benefit other similarly situated employees whose benefits were denied without a reasoned basis for the denial."). Thus, the Court finds it appropriate, in its discretion, to award Plaintiff attorneys' fees.

D. Count II

Plaintiff also moves to "sever Count 2 under Federal Rule of Civil Procedure 21 and dismiss it without prejudice because it is preempted."[38] (Doc. No. 88-2 at 17 n.13). Rule 21 provides that the Court may at any time, on motion or on its own, add or drop a party or claim. Under Rule 21, the Court must make an independent determination that dropping this claim is appropriate. Here, the Court has little difficulty concluding that the interests of justice support dropping the claim as requested, given both its potential for increasing judicial efficiency in resolving this dispute and joining in the motion to drop the claim by Defendants. (Doc. No. 97 at 24). The Court notes that it need not "sever" the claim first in order to dismiss it under Rule 21.

While Plaintiff requests dismissal *without* prejudice, Defendants request dismissal *with* prejudice. (Doc. No. 97 at 24). Courts have found dismissal with prejudice to be appropriate when a breach of contract claim is preempted by ERISA. *See Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901, 944 (M.D. Tenn. 2013) (dismissing with prejudice "breach of the underlying

---

[38] The parties concur that Plaintiff's breach-of-contract claim is preempted by ERISA. The Court agrees with this conclusion. *See Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) ("This circuit . . . has repeatedly recognized that virtually all state law claims relating to an employee benefit plan are preempted by ERISA."); *Daniel v. Eaton Corp.*, 839 F.2d 263 (6th Cir.), *cert. denied*, 488 U.S. 826 (1988) (state law breach of contract claim preempted by ERISA).

insurance contracts" as preempted by ERISA); *Wilson v. Unum Grp.*, No. CV 20-122-DLB, 2021 WL 4268046, at *3 (E.D. Ky. Sept. 20, 2021) (dismissing with prejudice breach of contract claim as "expressly" preempted by ERISA); *Burgos v. Grp. & Pension Administrators, Inc.*, 286 F. Supp. 2d 812, 819 (S.D. Tex. 2003) (same). Accordingly, Plaintiff's breach of contract claim (Count II) will be dismissed with prejudice.

## CONCLUSION

One thing in this case seems especially clear: Defendants absolutely do not want Plaintiff to receive benefits under the Plan. The Court does not presume to tell Defendants that they should feel otherwise or that their desired result could not have been lawfully achieved. What the Court can say, however, is that if this is the kind of result Defendants want, they would be well served to do things differently from how they did things here. It would behoove them to promulgate a plan with different (and ideally much more comprehensible)[39] substantive provisions.[40] And it

---

[39] To be clear, the Plan is sufficiently comprehensible for the Court to make each of the determinations about its construction that the Court has made herein. But that does not change the fact that—as reflected by the multiple issues regarding the Plan's terminology and related matters flagged herein by the Court—the Plan would benefit from substantially more clarity and consistency.

[40] The Ninth Circuit has discussed the import of a drafter of an ERISA plan making its intentions unambiguous:

> We think it appropriate to insist, as we did in *Kearney*, that the text of a plan be unambiguous. If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so. It is not difficult to write, "The plan administrator has discretionary authority to grant or deny benefits under this plan." When the language of a plan is unambiguous, a company purchasing the plan, and employees evaluating what their employer has purchased on their behalf, can clearly understand the scope of the authority the administrator has reserved for itself. As we wrote in *Sandy*, it is "easy enough" to confer discretion unambiguously "if plan sponsors, administrators, or fiduciaries want benefits decisions to be reviewed for abuse of discretion." 222 F.3d at 1206. Where they fail to do so, "in this circuit at least, they should expect *de novo* review." *Id*.

*Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Emps. of Transferred GE Operations*, 244 F.3d 1109, 1113–14 (9th Cir. 2001).

would be imperative for them to follow the plan's procedures for resolving claims, rather than doing what they did here (despite still refusing to acknowledge it): embark on a sequence of decisions (or purported decisions) bearing no resemblance to the decision-making (in terms of who makes what decisions and when) called for by the Plan.

For the reasons discussed herein, the Motion will be granted with respect to Count I, and Count II will be dismissed with prejudice. An appropriate order and judgment (with respect to liability only) will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE